**BROTHERHOOD OF MAINTENANCE OF WAY EMPLOYEES, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

No. 89–1580.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 13, 1990.

Decided Nov. 30, 1990.

---

Richard S. Edelman, with whom John O'B. Clarke, Jr., Washington, D.C., was on the brief, for petitioner.

Clyde J. Hart, Jr., Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, Henri F. Rush, Deputy Gen. Counsel, and John J.

McCarthy, Jr., Deputy Associate Gen. Counsel, I.C.C., and James F. Rill, Asst. Atty. Gen., Robert J. Wiggers, John J. Powers, III, Attys., U.S. Dept. of Justice, were on the brief, for respondents. Laurence H. Schecker, Atty., I.C.C., also entered an appearance for respondents.

Paul R. Berger, with whom John H. Broadley, Washington, D.C., was on the brief, for intervenor.

Before MIKVA, EDWARDS and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In 1984, the Interstate Commerce Commission ("ICC" or "Commission") authorized the Maine Central Railroad Company ("MEC") to lease a section of rail line to the Twin State Railroad Corporation. Under the terms of the authorization, MEC was required to implement certain employee protective conditions, known as the *Mendocino Coast* conditions, on behalf of workers adversely affected by the lease transaction. This case arises from a claim by Norman Bilodeau, a former MEC employee, for *Mendocino Coast* protective benefits. An arbitrator rejected Mr. Bilodeau's claim on the grounds that he was not adversely affected by the lease transaction. The Brotherhood of Maintenance of Way Employees ("BMWE" or "union") now challenges two ICC decisions denying review of the arbitrator's ruling.

▇ As a general rule, in cases on employee protective conditions, arbitration decisions regarding questions of causation, calculation of benefits and other factual

matters are binding and final. Only in very limited circumstances does the ICC review arbitration awards settling disputes under employee protective conditions. The arbitration award at issue here does not fall within the narrow class of rulings subject to ICC reconsideration; therefore, the Commission properly declined to review the arbitrator's decision rejecting Mr. Bilodeau's claim. Because we can find no legal error in either the arbitrator's award or the Commission's affirmance thereof, we reject the petition for review.

## I. BACKGROUND

In May 1984, the Commission approved the lease and operation by Twin State Railroad Corporation of a MEC rail line running from St. Johnsbury, Vermont to Whitefield, New Hampshire.[1] Under section 11347 of the Interstate Commerce Act,

[w]hen a rail carrier is involved in a transaction for which approval is sought under ... this title, the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under Section 405 of the Rail Passenger Service Act (45 U.S.C. 565).

49 U.S.C. § 11347 (1988).[2] To satisfy the labor protective conditions of section 11347 in this case, the ICC imposed the so-called *Mendocino Coast* conditions.[3] In relevant part, the conditions require the provision of benefits to any employee "who, as a result of a transaction[,] is placed in a worse

---

1. *Guilford Transp. Indus., Inc.—Control—Boston & Maine Corp.*, Finance Docket No. 29720 (Sub–No. 1) (served May 22, 1984); *Guilford Transp. Indus., Inc.—Control—Delaware & Hudson Ry.*, Finance Docket No. 29772 (served May 22, 1984).

2. The incorporated section of the Rail Passenger Service Act provides, in part, that the "fair arrangement" to which section 11347 refers

   shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (including continuation of pension rights and

benefits) to such employees under existing collective-bargaining agreements or otherwise; ... (3) the protection of such individual employees against a worsening of their positions with respect to their employment; ....

45 U.S.C. § 565(b) (1988).

3. *See Mendocino Coast Ry.—Lease and Operate—California Western R.R.*, 354 I.C.C. 732 (1978), *modified*, 360 I.C.C. 653 (1980), *aff'd sub nom. Railway Labor Execs. Ass'n v. United States*, 675 F.2d 1248 (D.C.Cir.1982).

position with respect to his compensation and rules governing his working conditions."[4]

In June 1984, MEC issued notice of the lease and of its anticipated effect on certain employee positions. *See Maine Cent. R.R.—Lease (Arbitration Review)*, Finance Docket No. 29720 (Sub–No. 1A), slip op. at 1 (served Dec. 8, 1988) *("1988 Decision")*, *reprinted in* Joint Appendix ("J.A.") 102. MEC and BMWE then negotiated an implementing agreement detailing the application of the *Mendocino Coast* conditions to MEC employees. Under section 2(b) of the implementing agreement,

> [a]ny employee who is affected pursuant to a transaction ... and any employee who is displaced by an exercise of seniority as a result of the transaction, will be treated as an employee placed in a worse position with respect to his compensation.

*See Maine Cent. R.R.—Lease (Arbitration Review)*, Finance Docket No. 29720 (Sub–No. 1A), slip op. at 3 (served July 28, 1989) *("1989 Decision")*, *reprinted in* J.A. 139, 141.

Until November 1984, Mr. Bilodeau worked for MEC as a trackman in Whitefield, New Hampshire. When the lease was implemented, however, a more senior employee whose job had been abolished moved into Mr. Bilodeau's position. Mr. Bilodeau in turn "bumped" into a machine operator position by exercising his own seniority rights, suffering no loss of compensation as a result. *See 1988 Decision* at 2, *reprinted in* J.A. 103.

Mr. Bilodeau's new job was abolished several months later, and Mr. Bilodeau bumped into a trackman position in Maine, 150 miles away. When that job too was abolished, Mr. Bilodeau exercised his seniority once more to move into a different trackman position. In March 1986, Mr. Bilodeau was furloughed and simultaneously recalled to an extra position. At no time during this series of job transfers did Mr. Bilodeau experience any reduction in earnings. *Id.* Finally, in July 1986, Mr. Bilodeau was permanently furloughed when his job was abolished. *Id.*

MEC denied Mr. Bilodeau's subsequent claim for *Mendocino Coast* benefits on the grounds that Mr. Bilodeau's furlough was caused by a business decline stemming from a BMWE strike, rather than by the lease transaction. *See id.* BMWE requested arbitration. The arbitrator found that Mr. Bilodeau was not adversely affected by the lease transaction and therefore had no claim to benefits under the *Mendocino Coast* conditions or the implementing agreement. *See J.A. 43.* The Commission denied review of the arbitrator's ruling, *see 1988 Decision*, and refused the union's request for rehearing, *see 1989 Decision*. BMWE now petitions this court for review of the Commission decisions.

## II. *ANALYSIS*

BMWE's principal challenge on appeal is to the arbitrator's finding that Mr. Bilodeau's furlough was not caused by the lease transaction. According to BMWE, Mr. Bilodeau was moved from his original position as a trackman in Whitefield only because of the lease. If Mr. Bilodeau had not been moved in the first instance, then he would not have been furloughed later when MEC's business declined. Therefore, BMWE contends, Mr. Bilodeau's furlough was a result of the lease transaction, and Mr. Bilodeau is entitled to *Mendocino Coast* benefits. *See* Brief for Petitioner and Intervening Petitioner at 27–28.

BMWE argues that the contrary ruling of the arbitrator, and its affirmance by the ICC, rest on the application of an improper standard of causation. We note, however, that, as a threshold matter, BMWE has failed to establish the factual accuracy of its animating premise: that had Mr. Bilodeau remained in his original trackman position in 1984, he would not have been furloughed as a result of MEC's business decline in 1986. Indeed, the union

---

**4.** *Norfolk & Western Ry.—Trackage Rights—Burlington Northern, Inc.,* 354 I.C.C. 605 (1978) (Conditions Appendix, art. I, § 1(b)). The *Norfolk & Western* conditions were in substantial part incorporated by *Mendocino Coast.*

has not even attempted to prove the accuracy of the assertion that Mr. Bilodeau's furlough can be traced somehow to the lease transaction. There is simply nothing in the record to suggest that but for the lease of 1984, Mr. Bilodeau would have remained in his trackman position despite the business slowdown of 1986.

Accordingly, the arbitrator determined that the MEC lease transaction did not adversely affect Mr. Bilodeau. This conclusion was based on two specific arbitral findings critical to the instant case. First, the arbitrator found that Mr. Bilodeau was not "placed in a worse position" as a result of his initial move from the Whitefield trackman position. Because such moves are not uncommon in Mr. Bilodeau's craft and because Mr. Bilodeau suffered no loss of earnings, the arbitrator concluded that Mr. Bilodeau's initial move had not adversely affected either his working conditions or his compensation. *See* J.A. 40.[5] Second, the arbitrator found that Mr. Bilodeau's ultimate furlough was caused by a diminution in MEC business. J.A. 43. This finding is undisputed. Thus, the arbitrator held that the lease transaction itself did not place Mr. Bilodeau in an adverse position as contemplated by *Mendocino Coast* and the parties' implementing agreement, and therefore denied Mr. Bilodeau's claim for benefits. J.A. 42–43.

■ Commission review of arbitration awards under employee protective conditions is strictly limited. The Commission confines its review to arbitral decisions implicating "recurring or otherwise significant issues of general importance regarding the interpretation of [its] labor protective conditions." *Chicago & North Western Transp.—Abandonment*, 3 I.C.C.2d

729, 736 (1987), *aff'd International Bhd. of Elec. Workers v. ICC*, 862 F.2d 330 (D.C. Cir.1988) (the *"Lace Curtain"* decision). Final resolution of factual matters, on the other hand, is committed to arbitral judgment. *Id.* In particular, questions of causation are explicitly placed outside the scope of ICC review. *Id.* at 735 ("We continue to believe that mandatory arbitration is appropriate for the final resolution of causation issues....").

■ Under the standards announced in *Lace Curtain*, Commission review is not warranted in this case. Whether Mr. Bilodeau was adversely affected by the MEC lease transaction, and hence eligible for benefits, is a factual question of causation, committed to the judgment of the arbitrator. We find no merit in BMWE's contention that review is appropriate in this case because the arbitrator employed an unduly restrictive standard of causation in making his findings. To the extent that the arbitrator rejected an extreme "but for" analysis, under which even the most attenuated connection between a transaction and an employee displacement would entitle the employee to benefits, he correctly followed Commission precedent. *See, e.g., Atlantic Richfield Co.—Control—Butte, Anaconda & Pac. R.R.*, Finance Docket No. 28490 (Sub–No. 1) (served Mar. 2, 1988); *Southern Ry.—Control—Central of Ga. Ry.*, 317 I.C.C. 729, 730–31 (1963), *aff'd sub nom. Railway Labor Execs. Ass'n v. United States*, 226 F.Supp. 521 (E.D.Va.), *vacated on other grounds*, 379 U.S. 199, 85 S.Ct. 307, 13 L.Ed.2d 338 (1964). And, contrary to BMWE's argument, we can discern no inconsistency between the Commission's failure to adopt a "but for" standard of causation and section 11347 of the Interstate Commerce Act.

---

**5.** Intervenor MEC argues for a different approach to evaluating the effects of Mr. Bilodeau's initial displacement. According to MEC, a displacement puts an employee in a "worse position" within the meaning of *Mendocino Coast* if and only if it adversely affects employee contractual rights, such as seniority rights, and regardless of whether such displacements are common industry practice. That Mr. Bilodeau's contractual seniority rights were not abrogated by his move from the Whitefield position is, under MEC's reasoning, dispositive evidence that he was not adversely affected by the move. *See* J.A. 37, 92. MEC's position on this point finds some support in *United Transportation Union v. United States*, 905 F.2d 463, 468–70 (D.C.Cir.1990). In this case, however, the arbitrator relied in part on his finding that employees like Mr. Bilodeau are commonly subjected to moves. Therefore, we need not resolve the question whether the preservation of contractual rights is by itself sufficient to show the absence of adverse effect.

Nor are we persuaded by BMWE's argument that Mr. Bilodeau is contractually entitled to benefits under section 2(b) of the parties' implementing agreement. The arbitrator concluded that the agreement covers only those employees who are adversely affected by a transaction, thus excluding Mr. Bilodeau from its scope. *See* J.A. 40. Under *Lace Curtain*, the arbitrator's interpretation of the MEC–BMWE implementing agreement is entitled to extreme deference; so long as the arbitrator's award "draw[s] its essence" from the implementing agreement, it must be affirmed. *See Lace Curtain*, 3 I.C.C.2d at 735.[6] In this case, we can find no basis upon which to question the arbitrator's reading of section 2(b) as incorporating a threshold requirement of adverse effect. Even if we disagreed with the arbitrator's construction, however, we could not say that it failed to "draw its essence" from the agreement. *See United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 371, 98 L.Ed.2d 286 (1987) ("as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision"); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. at 599, 80 S.Ct. at 1362 ("so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his"); *American Postal Workers Union v. United States Postal Serv.*, 789 F.2d 1, 4–8 (D.C.Cir.1986) (judges have no business second-guessing arbitrators' judgments). Because the arbitration award at issue clearly satisfies this deferential standard, we find no error in the Commission's denial of review.

This court already has approved the arrangement by which the ICC defers questions arising under employee protective conditions to arbitration and strictly limits its review of the resulting arbitral decisions. *See International Bhd. of Elec. Workers v. ICC*, 862 F.2d 330 (D.C.Cir. 1988) (affirming *Lace Curtain*). Essentially, the Commission is authorized to use arbitration for dispute resolution without duplicating the work of its arbitrators on appeal. That is precisely what the Commission did in this case, and we can find no reason to disturb its judgment.

### III. Conclusion

For the reasons set forth above, we find that the arbitration award in this case is not subject to Commission review. Therefore, the Commission decisions are affirmed and the petition for review hereby denied.

*So ordered.*

---

**6.** This extremely deferential standard of review is derived from the Supreme Court's "Steelworkers Trilogy," establishing very limited judicial review of arbitration awards in the collective bargaining context. *See United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).