RAILWAY LABOR EXECUTIVES'
ASSOCIATION, Petitioner,

v.

UNITED STATES of America and the
Interstate Commerce Commission,
Respondents,

Boston & Maine Corporation,
et al., Intervenors.

Nos. 90–1484, 91–1024, 91–1066, 91–1185,
91–1261, 91–1272 and 91–1420.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 29, 1992.

Decided March 12, 1993.

*John O'B. Clarke, Jr.*, with whom *Elizabeth A. Nadeau*, Washington, DC, was on the brief, for petitioner Railway Labor Executives' Ass'n.

*Clinton J. Miller, III*, Cleveland, OH, for petitioner United Transp. Union.

*John O'B. Clarke, Jr.*, Washington, DC, *Clinton J. Miller, III*, Cleveland, OH, and *Elizabeth A. Nadeau*, Washington, DC, were on the joint brief, for petitioners Railway Labor Executives Ass'n and United Transp. Union.

*John P. Cronin*, North Billerica, MA, *John H. Broadley*, and *Roger W. Pincus*, Washington, DC, were on the brief, for petitioners Boston & Maine Corp., et al.

*Clyde J. Hart*, Atty., I.C.C. (ICC), with whom *Robert S. Burk*, Gen. Counsel, *Henri F. Rush*, Deputy Gen. Counsel, *John J. McCarthy, Jr.*, Associate Gen. Counsel, and *Virginia Strasser*, Atty., ICC, Washington, DC, were on the brief, for respon-

dents. *John J. Powers, III* and *Robert J. Wiggers*, Attys., Dept. of Justice, Washington, DC, also entered appearances for respondents.

Before: MIKVA, Chief Judge, and D.H. GINSBURG and RANDOLPH, Circuit Judges.

*Per Curiam:*

These consolidated cases represent a broad range of challenges to decisions of the Interstate Commerce Commission surrounding the efforts of Guilford Transportation Industries to lease rail lines and trackage rights from four of its subsidiaries to a fifth subsidiary. For the reasons that follow, we remand to the ICC its decision affirming an arbitrator's award that modified the collective bargaining agreements of certain employees. We affirm all of the other challenged decisions of the ICC.

## I. BACKGROUND

In 1986, Guilford Transportation Industries ("GTI") began implementing a plan to lease rail lines and related trackage rights from four of its subsidiaries—the Delaware and Hudson Railway Company ("D & H"), the Boston & Maine Corporation ("B & M"), the Maine Central Railroad Company ("MEC"), and the Portland Terminal Company ("PT")—to a fifth subsidiary, the Springfield Terminal Railway Company ("ST"). From late 1986 through late 1987, the five subsidiaries filed notices of the transactions with the Interstate Commerce Commission ("ICC" or "Commission") under the procedures set out in 49 C.F.R. § 1180.4. The Commission's regulations permit the use of these procedures, instead of the prior approval requirements of 49 U.S.C. § 11343, for "transactions within a corporate family that do not result in adverse changes in service levels, significant operational changes, or a change in the competitive balance with carriers outside the corporate family." 49 C.F.R. § 1180.-2(d)(3).

These transactions were of great concern to rail labor, for they would make ST the *de facto* operator of the entire GTI system and subject the labor forces of the other subsidiaries to ST's less favorable rates of pay, rules, and working conditions. Consequently, rail labor (the Railway Labor Executives' Association ("RLEA") and the United Transportation Union ("UTU")) sought the maximum possible protection under the Interstate Commerce Act ("ICA"), which imposes labor protective conditions on such transactions in order to protect affected employees. 49 U.S.C. § 11347.

In order to comply with the requirements of § 11347, the Commission has developed a series of protective conditions appropriate to lease and trackage rights transactions, known as *"Mendocino* conditions" because of their origin in *Mendocino Coast Ry. Inc.—Lease and Operate—California Western R.R.,* 354 I.C.C. 732 (1978), as well as in *Norfolk and Western Ry.—Trackage Rights—Burlington Northern, Inc.,* 354 I.C.C. 605, 611 (1978), *both modified, Mendocino Coast Ry. Inc.—Lease and Operate—California Western R.R.* 360 I.C.C. 653 (1980), *both aff'd sub nom., RLEA v. United States,* 675 F.2d 1248 (D.C.Cir. 1982). Labor challenged the application of the *Mendocino* conditions to these transactions, arguing that the leases had the cumulative impact of a merger or consolidation of carriers, which warranted the heightened procedural protections of the conditions set forth in *New York Dock—Control—Brooklyn Eastern Dist.,* 360 I.C.C. 60 (1979). In its *February 17, 1988 Decision,* the Commission imposed a hybrid set of protective conditions on the transactions, including the substantive provisions of the *Mendocino* conditions and the increased procedural safeguards of the *New York Dock* conditions. *Delaware and Hudson Ry. Co.—Lease and Trackage Rights Exemption—Springfield Terminal Ry. Co.,* 4 I.C.C.2d 322. These elevated procedural safeguards prohibited the railroads from implementing any unconsummated transactions until the parties reached an implementing agreement through negotiation or arbitration.

The parties were unable to reach an implementing agreement, primarily because they were unable to agree whether the

employees of the lessor carriers should be allowed to follow their work to ST with their collective bargaining agreements ("CBAs") intact. They submitted the case to arbitration. On June 12, 1988, Arbitrator Richard Kasher issued an award setting forth the implementing agreement. The Kasher Award required ST, in operating the leased lines, to apply the rates of pay, rules, and working conditions contained in the lessor carriers' CBAs.

In response to ST's petition, the Commission stayed the Kasher award pending review. In its *January 10, 1989 Decision,* the Commission partially overturned the award, holding that the preservation of the lessor carriers' rates of pay and work rules would effectively foreclose the authorized transactions, since the purpose of the transactions was to achieve greater efficiency by applying the more economical ST collective bargaining agreements to the entire GTI system. The Commission returned the unsettled issues to the parties for negotiation and, if necessary, arbitration.

The parties were again unable to reach an agreement. On March 13, 1990, the second arbitrator, Robert O. Harris, issued his report and award. Under the Harris Award, the lessor carriers' collective bargaining agreements were modified to allow ST to create a single seniority system, to employ smaller crews than those used by the lessor carriers, and to require its employees to perform incidental work outside the scope of their duties as defined by their craft. Arbitrator Harris stated, however, that if "[I] were not bound by the ICC determination that Section 3 of the Kasher Implementing Award could not be approved, [I] too would have reconciled the competing interests involved in the approved transaction by imposing the lessor carriers' collective bargaining agreements." In its *October 4, 1990 Decision,* the Commission affirmed the Harris Award. UTU challenges the adoption of the Harris Award. RLEA instead disputes the previous partial override of the Kasher Award.

Another issue arose concerning a work stoppage by ST employees that commenced just as the leasing process began in November, 1987 and ended in June, 1988. UTU alleges that it called the strike because of safety hazards in the operation of the railroad, and that the strike was thus a protected activity under the Federal Railroad Safety Act ("FRSA"), 45 U.S.C. 441(a). ST contends that the striking employees were not engaged in a protected activity, and that they therefore constructively resigned their positions and thereby forfeited their rights to protective benefits under *Mendocino Coast* and the two arbitration awards. In its *December 11, 1990 Decision,* the Commission concluded that the employees who participated in the strike did not, by virtue of their participation, forfeit entitlement to these benefits. The carriers challenge that decision.

Still another dispute arose over the lack of continuity between two periods of benefit protection guaranteed by the protective conditions. Under the hybrid *New York Dock/Mendocino Coast* conditions imposed by the Commission, employees affected by the lease transactions are entitled to both a 75–day "make-whole" period and a six-year "benefit protective" period. The 75–day period commenced on the date the lease transactions began to affect the employees. Until 1991, all the parties agreed that the six-year period would not start until the effective date of the implementing agreement. Usually, these periods of protection are contiguous. Because of the drawn-out nature of the disputes in this case, however, it became apparent that there would be a "gap" between the two protective periods unless the 75–day make-whole period were expanded to cover the entire time until the date of implementation or the six-year "benefit protective" period were started before the completion of an implementation agreement.

Both the Kasher and Harris Awards provided that the six-year benefit protective period would commence on the effective date of the implementing agreement. RLEA asserted that the make-whole period should extend to the effective date of the implementing agreement to fill the result-

ing gap. In its *April 2, 1991 Decision,* the Commission rejected RLEA's claim. It limited the make-whole period to 75 days and the overall protective period to six years and 75 days. RLEA challenges this decision.

After the April 2 decision, UTU, which until that point had agreed that the six-year benefit protective period should commence on the effective date of the implementing agreement, argued instead that the start of the benefits period should be pushed back to 1988 so that the make-whole and benefits periods would be contiguous. The Commission rejected this claim in its *July 5, 1991 Decision.* UTU contests that decision.

This court faces the daunting task of addressing the intricate web of claims brought by the many parties involved in this litigation. In sum: RLEA challenges the Commission's reversal of the Kasher Award, claiming that the reversal was violative of the protection of labor interests mandated by the Interstate Commerce Act, at 49 U.S.C. § 11347. RLEA also argues that the Commission acted in an arbitrary and capricious manner by subjecting the Kasher decision to inappropriately broad review. In addition, RLEA asserts that the Commission violated the Due Process and Just Compensation Clauses of the Fifth Amendment to the Constitution of the United States by modifying the terms of the lessor carriers' collective bargaining agreements. Finally, RLEA claims that the 75–day make-whole period should have been extended until the effective date of the implementation agreement in order to avoid a gap in protection.

UTU challenges the Commission's upholding of the Harris Award, rather than its overturning of the Kasher Award. It does so on statutory and constitutional grounds similar to those advanced by RLEA. In addition, UTU claims that the start of the six-year benefit protective period should be pushed back to an earlier date to make it contiguous with the 75–day make-whole period.

The railroads challenge the Commission's decision that the railroad employees did not surrender their right to protective benefits by striking between 1987 and 1988. They also challenge RLEA's standing to petition or intervene in this matter.

## II. RLEA'S STANDING

 The carriers dispute the standing of RLEA, a voluntary, unincorporated association of the chief executive officers of the major rail labor unions, to petition or intervene in this case. We do not believe it is necessary to resolve the complex question of RLEA's standing, and we therefore pretermit the issue.

It is a longstanding principle that courts should avoid passing on constitutional issues unless the resolution of these issues is necessary to the disposition of the case. *See, e.g., Ashwander v. TVA,* 297 U.S. 288, 346–348, 56 S.Ct. 466, 482–483, 80 L.Ed. 688 (1936) (Cardozo, J., concurring). In accordance with this principle, the Supreme Court has repeatedly held that if one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case. *See Doe v. Bolton,* 410 U.S. 179, 189, 93 S.Ct. 739, 746, 35 L.Ed.2d 201 (1973) ("[W]e need not pass upon the status of these additional appellants in this suit, for the issues are sufficiently and adequately presented by Doe and the physician-appellants, and nothing is gained or lost by the presence or absence of the [other appellants]."). *Cf. Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 72 n. 16, 98 S.Ct. 2620, 2629 n. 16, 57 L.Ed.2d 595 (1978) ("We need not resolve the question of whether Duke Power is a proper party since jurisdiction over appellees' claims against the NRC is established, and Duke's presence or absence makes no material difference to either our consideration of the merits of the controversy or our authority to award the requested relief.").

In the present case, RLEA's presence or absence is of little consequence. Admittedly, RLEA challenges the Commission's rejection of portions of the Kasher Award, whereas UTU disputes the Commission's adoption of the Harris Award. These dif-

ferent strategies are, however, based primarily on the same substantive arguments concerning the Fifth Amendment and the labor-protection language of 49 U.S.C. § 11347, and they are designed to achieve the same result—a remand to the Commission with instructions to preserve fully the employees' collective bargaining agreements. Our disposition of the main issue of this case is therefore unaffected by RLEA's presence.

Moreover, the different approaches of UTU and RLEA do not affect our analysis of the six-year benefit protective period's start date. All of the parties initially agreed that the labor protective provisions would become effective when an implementing agreement was in place. RLEA, by challenging the Commission's rejection of the earlier Kasher Award, implies that an implementing agreement should have been in place in 1988, at the time of that rejection. UTU, on the other hand, disputes only the adoption of the Harris Award, and thus does not directly assert that the implementation agreement should have taken effect in 1988.

This distinction is not relevant to the start date of the six-year period, however. The parties originally agreed that the benefit protective period would commence only when an implementing agreement was *in fact* in place. Whether an implementing agreement *should* have been in place earlier than it was, as RLEA suggests, therefore does not affect the date that labor protection properly began. Consequently, even if the Commission were, on remand, to vacate its reversal of the Kasher Award, the start date of the labor protective conditions would remain November 4, 1990, the time when the implementation agreement actually went into effect by virtue of the Commission's approval of the Harris Award.

There are only two issues that RLEA raises that UTU arguably does not. One is the proper standard of review of an arbitrator's decision by the Commission. RLEA disputes the non-deferential standard of review employed by the Commission in vacating portions of the Kasher Award. UTU, on the other hand, does not challenge the standard of review used by the Commission in upholding the Harris Award. Nevertheless, a consideration of the proper standard is implicit in our evaluation of the Commission's approval of the Harris Award. Simply by challenging the result of the Commission's review of the Harris arbitration, UTU necessarily raises the standard of review issue, and RLEA need not be present for us to consider it.

The other issue that RLEA alone raises is the length of the make-whole period. Whereas UTU argues that commencement of the six-year protective period should retroactively be pushed to an earlier date so that the period will run consecutively with the 75–day make-whole period, RLEA urges that the 75–day period be expanded to fill the "gap" between the two periods. UTU does not proffer this latter argument, and, indeed, it concedes that the Commission was correct in limiting the make-whole period to 75 days.

We will not, however, enter into a complex and lengthy inquiry concerning RLEA's standing merely because RLEA is the only party to raise one particular argument in this enormous and multifarious case—an argument that we confidently and concisely reject on the merits later in this opinion. *See infra* pp. 816–19. "Although standing is usually a threshold inquiry, both the Supreme Court and this Circuit have long recognized the propriety of avoiding difficult, constitutionally-based justiciability issues when a case is more simply resolved on another basis." *Coker v. Sullivan*, 902 F.2d 84 (D.C.Cir.1990). Accordingly, "[p]rudential considerations ... restrain us from deciding [a] difficult and unquestionably far-reaching standing question when the merits of the case readily provide a fair, clear resolution of the appeal." *Chinese American Civic Council v. Atty. Gen. of United States*, 566 F.2d 321 (D.C.Cir.1977). We therefore pretermit the matter of RLEA's standing and proceed directly to the merits.

III. STANDARD OF REVIEW OF ARBITRATOR KASHER'S DECISION

■ The Commission has authority to review an arbitrator's award rendered after

"final and binding" arbitration of a dispute concerning labor protective conditions. *International Bhd. of Elec. Workers v. ICC*, 862 F.2d 330, 335 (D.C.Cir.1988) (*"IBEW"*). *See also United Transp. Union v. United States*, 905 F.2d 463, 467 n. 5 (D.C.Cir. 1990). In this case the Commission's order leading to the Kasher arbitration stated expressly that the arbitrator's decision would remain subject to Commission review. *See February 19, 1988 Decision* at 10, 4 I.C.C.2d 322, 332. RLEA's quarrel is not with the Commission's assertion of authority, but with the standard of review the Commission applied in considering Kasher's award. *See January 10, 1989 Decision.*

■ The Commission first announced its power to review the decisions of arbitrators in *Lace Curtain*. *See Chicago & North W. Transp. Co.—Abandonment*, 3 I.C.C.2d 729 (1987) (*"Lace Curtain"*), *aff'd sub nom. IBEW*, 862 F.2d 330 (D.C.Cir.1988). It is true, as RLEA points out, that the Commission there relied extensively on the *Steelworkers Trilogy*,[1] which narrowly confined the judiciary's role in ordering arbitration of labor disputes under collective bargaining agreements and in reviewing the resulting arbitration awards. 3 I.C.C.2d at 733–36. But *Lace Curtain* also cited *Wallace v. Civil Aeronautics Board*, 755 F.2d 861, 864–65 (11th Cir.1985), which upheld an agency's "searching scrutiny" of an arbitration decision. The *Wallace* court explained that, for reasons of relative expertise, it was appropriate for an agency to display less deference to a labor arbitration decision than a court would under *Steelworkers*. *See* 755 F.2d at 865. The Commission in *Lace Curtain* concluded that its review of arbitration awards would be consistent with both *Steelworkers Trilogy* and *Wallace*. *See* 3 I.C.C.2d at 736.

Since then the Commission has employed a sliding scale of deference. An arbitrator's judgments about matters of evidence and causation are treated with deference.

An arbitrator's interpretations of Commission regulations and views regarding transportation policy are subject to more searching review. *See, e.g., CSX Corp.—Control*, 4 I.C.C.2d 641, 648 (1988); *Lace Curtain*, 3 I.C.C.2d at 736. *See also Brotherhood of Maintenance of Way Employees v. ICC*, 920 F.2d 40, 44–45 (D.C.Cir.1990); *Employees of the Butte, Anaconda & Pacific Ry. v. United States*, 938 F.2d 1009, 1013–14 (9th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1474, 117 L.Ed.2d 618 (1992). The Commission's approach to the Kasher Award adhered to these standards. The Commission focused not on narrow factual issues, but on the perceived failure of the decision to fulfill the agency's broad mandate. *See January 10, 1989 Decision* at 6.

### IV. SCOPE OF MANDATORY LABOR PROTECTIVE CONDITIONS

■ The union petitioners challenge the Commission's affirmance of Arbitrator Harris' modifications to the collective bargaining agreements governing certain employees prior to the lease transaction. The petitioners argue that these modifications are barred by § 11347 of the Interstate Commerce Act, and moreover that the Commission lacks the authority to modify the rail carriers' contractual obligations under the CBAs.

The Commission contends that the Act authorizes it to modify a CBA as necessary to allow a lease transaction to go forward, and that the particular modifications made in this case were proper. The authority of the Commission to resolve labor disputes relating to consolidations, mergers and leases of railroads is delineated in several sections of the Interstate Commerce Act. *See* 49 U.S.C. §§ 11341, 11343–47.

In *Norfolk and Western v. American Train Dispatchers*, — U.S. —, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991), the Supreme Court held that the provision of § 11341(a) that exempts a carrier "from all other law

---

**1.** *See United Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

... as necessary to let that person carry out the transaction" empowers the ICC to modify a CBA. The Court reasoned that "all other law" includes a labor contract. That decision is not applicable here, however, because § 11341(a) applies only to transactions exempted under subchapter III, of which it is a part. The Commission exempted the transaction at issue here under § 10505, which is in subchapter I. *See D & M Ry.—Lease and Trackage Rights Exempt—Springfield Term.*, 4 I.C.C.2d 322 (1988).

The Commission concedes that § 11341(a) does not authorize the modifications at issue, but contends that § 11347 does so. That section provides:

> When a rail carrier is involved in a transaction for which approval is sought under sections 11344 and 11345 or [under] section 11346 of this title, the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 405 of the Rail Passenger Service Act (45 U.S.C. 565).

At first blush, § 11347 might not appear even to apply to this transaction; it applies only "when a rail carrier is involved in a transaction for which approval is sought under sections 11344 and 11345 or [under] section 11346 of this title." It has previously been held, however, that § 11347 applies to § 10505 transactions, *see Brotherhood of Locomotive Engineers v. ICC*, 909 F.2d 909, 912 (6th Cir.1990); *see also RLEA v. ICC*, 914 F.2d 276, 279 (D.C.Cir. 1990), and because neither party disputes the matter we have no occasion to question the application of § 11347 to this case.

Thus arise the questions (1) whether, as the ICC maintains, § 11347 is an independent source of authority for the agency to modify a CBA where its authority under § 11341(a) to exempt a transaction from "all other law" does not apply, and (2) whether, as the RLEA argues, § 11347 limits the ICC's power to modify a CBA. The

latter question was expressly reserved by the Court in *Norfolk and Western*, —— U.S. ——, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991).

The Commission interprets § 11347 as authorizing it to modify a CBA whenever necessary to effectuate a covered transaction. If Congress has not "directly spoken to the precise question at issue," and the Commission's interpretation of the statute it administers is a permissible one, then we must defer to it. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Section 11347 does not directly address the question whether the ICC is authorized to change a CBA, but it does incorporate by reference certain extrinsic labor protective provisions that reflect upon that question. We shall look through § 11347 to those underlying provisions, therefore, in order to apply the standards of *Chevron.*

First, the Commission must provide terms of employment "at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976." The pre-1976 terms were themselves based upon the Washington Job Protection Agreement of 1936. Although the record relating to the implementation of that agreement is somewhat murky, it appears that arbitrators were authorized under the WJPA to make certain changes to CBAs. *See CSX Corp.—Control—Chessie System, Inc. and Seaboard Coast Line Industries, Inc.*, 6 I.C.C.2d 715, 734–35 (1990) (recounting testimony of Referee Bernstein as to changes permissible under the WJPA). In view of that practice, it was reasonable for the Commission to interpret the reference in § 11347 to the pre-1976 terms as carrying forward into the present version of § 11347 its authority to change CBAs. Accordingly, pursuant to Step II of the *Chevron* analysis, we defer to the agency's judgment in this regard.

Second, § 11347 incorporates the protections afforded under the Rail Passenger Service [Amtrak] Act, 45 U.S.C. § 565, which provides that:

the protective arrangements shall include ... such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits ... to such [rail] employees under existing collective bargaining agreements; (2) the continuation of collective bargaining rights; [and] (3) the protection of such employees against a worsening of their positions with respect to their employment.... Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to section 5(2)(f) of the Interstate Commerce Act [§ 11347].

The statute clearly mandates that "rights, privileges, and benefits" afforded employees under existing CBAs be preserved.[2] Unless, however, every word of every CBA were thought to establish a right, privilege, or benefit for labor—an obviously absurd proposition—§ 565 (and hence § 11347) does seem to contemplate that the ICC may modify a CBA.[3]

At that level of generality, at least, the ICC's interpretation seems eminently reasonable, indeed indisputable. The Commission has not, however, addressed the meaning, and thus the scope, of those "rights, privileges, and benefits," that must be preserved, nor has it determined specifically whether the CBA provisions at issue here are entitled to statutory protection under that rubric. We thus remand for the ICC to make that determination in the first instance.

Regardless of how the ICC may read the above provision, however, it is clear that the Commission may not modify a CBA willy-nilly: § 11347 requires that the Commission provide a "fair arrangement." The Commission itself has stated that it may modify a collective bargaining agreement under § 11347 only as "necessary" to effectuate a covered transaction. *CSX*, 6 I.C.C.2d 715 (1990) ("We assume that any changes in CBAs will be limited to those necessary to permit the approved consolidation and will not undermine labor's rights to rely primarily on the RLA for those subjects traditionally covered by that statute"). We agree that whatever else a "fair arrangement" entails, the modification of a CBA must at a minimum be necessary to effectuate a transaction. The necessity limitation is explicit in § 11341(a), and we have no reason to believe that the Congress meant to give the Commission any wider latitude to modify the provisions of a CBA where § 11341(a) does not apply; § 11347 on its face provides more, not less, generous labor protection than does § 11341(a). We are also cognizant of the perhaps unan-

---

**2.** Section 11347 of the ICA states that the "arrangement and the order approving the transaction must require that the employees of the affected rail carrier not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Commission." Section 565(b)(3), as qualified by the next sentence of § 565(b), thus embodies the protection afforded by the labor protective conditions implemented under the ICA, which are not at issue here. Accordingly, § 565(b)(3) does not operate as an independent substantive limit on the Commission's authority to modify a CBA.

**3.** Subsections 565(b)(1)–(3) were taken verbatim from § 13(c) of the Urban Mass Transit Act, 49 U.S.C.App. § 1601 et seq. We addressed the scope of the labor protection afforded under that Act in *Amalgamated Transit U.I., AFL–CIO v. Donovan,* 767 F.2d 939, 953 (D.C.Cir.1985). We held there that the certification of a transit authority's labor protective conditions was improper under the UMTA where, under state law, the labor agreement did not provide for the continuation of collective bargaining rights, as mandated by the Act. In so holding, we noted that the:

> requirement that collective bargaining rights be continued does not in any way dictate the substantive provisions of a collective bargaining agreement.... Section 13(c) does not perpetuate the *substantive* terms of pre-acquisition bargaining agreements, but rather protects the *process* of collective bargaining. The substantive provisions of collective bargaining agreements may change, but section 13(c) requires that the changes may be brought about through collective bargaining, not by state fiat.

(Emphases in original.) We are not certain as to precisely what to make of this passage. The ICC relies upon and quotes only the first two sentences, while the RLEA and the UTU argue persuasively that they are made largely irrelevant by the last sentence. Given this state of internal conflict, we do not undertake to say what is the teaching of the earlier case relevant to the present case.

ticipated circumstance that § 11347 applies to the present transaction but § 11341(a) does not.

What, then, does it mean to say that it is necessary to modify a CBA in order to effectuate a proposed transaction? In this case the Commission reasonably interpreted this standard to mean "necessary to effectuate the purpose of the transaction." If the purpose of the lease transaction were merely to abrogate the terms of a CBA, however, then "necessity" would be no limitation at all upon the Commission's authority to set a CBA aside. We look therefore to the purpose for which the ICC has been given this authority. That purpose is presumably to secure to the public some transportation benefit that would not be available if the CBA were left in place, not merely to transfer wealth from employees to their employer. Viewed in that light, we do not see how the agency can be said to have shown the "necessity" for modifying a CBA unless it shows that the modification is necessary in order to secure to the public some transportation benefit flowing from the underlying transaction (here a lease).

Transportation benefits include the promotion of "safe, adequate, economical, and efficient transportation," and the encouragement of "sound economic conditions ... among carriers." 49 U.S.C. § 10101. In this case, the Commission did not specifically identify any transportation benefits to be had by reason of the lease transaction only if the CBAs are modified, but it did make a vague reference to certain "public interest factors" weighing in favor of the transaction. Piecing together various observations in the ICC's decision, we can discern that these factors include the "benefits that flow from the creation of a more competitive and efficient rail carrier," in light of the possibility that "rail service can cease and its cessation can harm the public." We cannot determine from these generalities, however, whether the Commission anticipated that the transportation benefits would arise solely from modifying the CBAs—in which case they would not be cognizable, per the analysis above—or rather found that the underlying leases would

give rise to transportation benefits that could not be realized except by modifying the CBAs. Insofar as Arbitrator Kasher touched upon the subject, moreover, he appears to have contemplated only the former:

> In the opinion of [the carrier], these lease transactions confirmed its view that operations conducted under the ST collective bargaining agreement resulted in lower operating costs and enhanced service levels. Specifically, [the carrier] concluded that reduced train and engine service manning levels, lower rates of pay and non-payment of arbitraries, permitted by the ST-UTU collective bargaining agreement were responsible for the reduced operating costs.

J.A. 228. *See also* J.A. 54–57 (Commissioners Lamboley and Simmons, dissenting in part) (noting that no showing of necessity had been made by Commission in authorizing changes to CBAs).

It is impossible to tell from this statement whether enhanced service levels would result solely from the reduced labor cost stemming from the modifications to the CBAs—when a producer's marginal cost declines it increases its output, i.e. service—or whether the leases themselves yield increased efficiencies. We shall thus remand this matter for the Commission to clarify whether there are in fact transportation benefits to be had from implementing the lease transactions, the realization of which necessitates abrogating the CBAs.

## V. FIFTH AMENDMENT CLAIMS

■ RLEA and UTU argue that the Commission's modification of the terms of the collective bargaining agreements constituted an uncompensated taking of private property in violation of the Fifth Amendment. Whatever the merits of the argument, this is not the forum in which it can be decided. The Fifth Amendment guarantees that when the government takes private property, it will provide just compensation. Under the Tucker Act, 28 U.S.C. § 1491(a), the United States Court of Federal Claims has original jurisdiction

over suits seeking compensation from the United States under the Constitution. Except for cases in which the amount in controversy is less than $10,000, in which event jurisdiction is concurrent with the federal district courts, *see* 28 U.S.C. § 1346(a)(2), the Federal Claims Court's jurisdiction in such actions is exclusive. "[T]akings claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act." *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 195, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985).

It is no answer for RLEA and UTU to say that they are seeking not compensation but a judgment setting aside the Commission's decision. The Taking Clause does not prohibit the government from taking private property. The Clause requires only that the government accomplish the taking in a particular way, namely, by paying for the property. *See First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 314–15, 107 S.Ct. 2378, 2385, 96 L.Ed.2d 250 (1987); *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1020, 104 S.Ct. 2862, 2881, 81 L.Ed.2d 815 (1984). There is no constitutional necessity for payment to be made in advance, at least so long as the government provides a way for the property owner to recover just compensation after the taking is completed. *See Ruckelshaus,* 467 U.S. at 1016, 104 S.Ct. at 2879. As we have said, those adversely affected by the Commission's action may pursue their claims in the Federal Claims Court or, depending on the amount at stake, in the federal district courts.

There is nothing to petitioners' further point that, at the least, we ought to construe § 11347 to avoid the possibility that the Commission has effectuated a taking in this case. The argument may rest on the familiar canon that if one permissible interpretation of statute would render it unconstitutional and another permissible interpretation would make it constitutional, the latter should prevail because the judiciary should not assume Congress meant to violate the Constitution. *Blodgett v. Holden,* 275 U.S. 142, 147–49, 48 S.Ct. 105, 106, 72 L.Ed. 206 (1927) (opinion of Holmes, J.). Or the argument may rely on the more debatable canon of construing statutes to avoid constitutional doubts. *Compare Johnson v. Robison,* 415 U.S. 361, 366–67, 94 S.Ct. 1160, 1165, 39 L.Ed.2d 389 (1974), *with Rust v. Sullivan,* —— U.S. ——, ——, 111 S.Ct. 1759, 1771, 114 L.Ed.2d 233 (1991). But these canons do not fit. Because just compensation is presumptively available under the Tucker Act, there is neither an unconstitutional result nor a constitutional doubt to be averted by interpretation. *See United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 127–28, 106 S.Ct. 455, 459, 88 L.Ed.2d 419 (1985). Although the Supreme Court has suggested that concerns about takings might influence statutory construction when "there is an identifiable class of cases in which application of a statute will necessarily constitute a taking" (*id.* at 128 n. 5, 106 S.Ct. at 459 n. 5, distinguishing *United States v. Security Industrial Bank,* 459 U.S. 70, 78, 103 S.Ct. 407, 412, 74 L.Ed.2d 235 (1982)), this is not such a case. The complaint is only that the Commission's specific application of the terms of § 11347 to this transaction results in a taking. In such circumstances, "adoption of a narrowing construction does not constitute avoidance of a constitutional difficulty; it merely frustrates permissible applications of a statute or regulation." *Riverside Bayview Homes,* 474 U.S. at 128, 106 S.Ct. at 459 (citation omitted). We therefore decline to consider the takings issue in our construction of § 11347.[4]

## VI. CREATION OF BENEFITS "GAP"

■ Pursuant to the hybrid *New York Dock/Mendocino Coast* conditions the

---

**4.** Both UTU and RLEA also make vague allegations about the deprivation of due process. Whether substantive or procedural due process they do not reveal. A substantive due process challenge to a clearly rational statutory scheme goes nowhere. *See Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976). The Commission's extensive arbitration procedures employed here refute any notion that procedural due process was absent.

Commission imposed on this transaction, the affected employees were entitled to two distinct periods of benefit protection. First, under Section Four of the *Mendocino Coast* provisions, each worker enjoyed a 75–day "make-whole" period commencing on the date the lease transactions affected him. *See Norfolk & Western Ry.—Trackage Rights—Burlington Northern, Inc.,* 354 I.C.C. 605, 611 (1978) (*"Mendocino Coast"*), *modified,* 360 I.C.C. 653 (1980), *aff'd sub nom. Railway Labor Executives' Ass'n v. United States,* 675 F.2d 1248 (D.C.Cir.1982). Second, under Section One of *Mendocino,* and tracing ultimately to the "Appendix C–1" provisions, the workers possessed a six-year "benefit protective" period. 354 I.C.C. at 610.[5] Although the parties agree that these periods typically will be contiguous (*i.e.,* the benefit protective period will commence upon the expiration of the make-whole period), here there was a three-year gap between the expiration of each worker's make-whole period (sometime in late 1987) and the commencement of the benefit protective period on the effective date of the implementing agreement in November 1990. RLEA and UTU raise separate challenges to the Commission's decisions creating this gap. RLEA claims that the make-whole period should have extended until the commencement of the implementing agreement, a scheme which would result in a total of nine years of benefit protection. By contrast, UTU argues that the periods should have been contiguous, providing six years and 75 days of continuous protection from the effective dates of the rail leases.

Like nearly every question in this dispute, this issue has a tortuous procedural history. Pursuant ostensibly to the agreement of the parties, both the Kasher and Harris Awards provided that the benefit protective period would commence on the effective date of the implementing agreement. Section Seven of the Kasher Award explicitly provided that the make-whole periods would extend from the date each worker was first affected by the lease transactions until the effective date of the implementing agreement. The Commission, in its initial review of the Kasher Award, *see January 10, 1989 Decision,* apparently affirmed Kasher's interpretation of the make-whole provision. *See id.* at 6–7. In response to a request by RLEA for clarification, however, the Commission later specified that although the parties were free to agree among themselves about the effective dates of the various protective periods, the total length of protection in any event could not exceed six years. *See October 26, 1989 Decision* at 9–10.[6] The Commission finally resolved the confusion in its *April 2, 1991 Decision* where it concluded that the make-whole period would run only for 75 days. *See id.* at 10.

RLEA argues that the last sentence of Section Four of the *Mendocino* provisions means that the make-whole period should extend until the effective date of the implementing agreement.[7] In its April 2, 1991 ruling, the Commission instead interpreted the sentence to mean that if the final implementing agreement provided for a larger

---

5. For the history of the origin and incorporation of the "Appendix C–1" conditions, *see Railway Labor Executives' Ass'n,* 675 F.2d at 1250–51.

6. The Commission later made clear that the overall limit it envisioned was actually six years and 75 days. *See January 5, 1990 Decision* at 5 n. 8.

7. The relevant portion of Section Four of *Mendocino* provides as follows:

Notwithstanding any of the foregoing provisions of this section, at the completion of the twenty- (20-) day notice period the railroads may proceed with the transaction, provided that all employees affected (displaced, dis-

missed, rearranged, et cetera) shall be provided with all of the rights and benefits of this appendix from the time they are affected through to expiration of the seventy-fifth (75th) day following the date of notice of the intended transaction. This protection shall be in addition to the protection period defined in article I, paragraph (d) [i.e. the "benefit protective" period]. If the above proceeding results in displacement, dismissal, rearrangement, et cetera other than as provided by the railroads at the time of the transaction pending the outcome of such proceedings, all employees affected by the transaction during the pendency of such proceedings shall be made whole.

354 I.C.C. at 611.

package of benefits than the "Commission-mandated minimum," the employees would be retroactively made whole for "the difference between the minimum benefits already received and the allowances ultimately provided for in the agreement for the 75 day period provided." *Id.* at 12. The ruling emphasized the importance of maintaining the overall six-year, 75–day limitation on the benefits period. *Id.* at 13.

The Commission is entitled to considerable deference when it has interpreted the terms of its own decrees or regulations. *See, e.g., Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986); *Sandstone Resources, Inc. v. FERC,* 973 F.2d 956, 959 (D.C.Cir.1992); *K N Energy, Inc. v. FERC,* 968 F.2d 1295, 1299–300 (D.C.Cir.1992); *Regular Common Carrier Conf. v. United States,* 803 F.2d 1186, 1197 n. 14 (D.C.Cir.1986). While the Commission's view of Section Four is not the only one possible, it seems to us plausible. RLEA's reading would vitiate the 75–day limit specified by the earlier part of the provision. Moreover, that reading would create a total of nine years of benefit protection in this case. The Commission consistently has stated—in this proceeding and others—that the total period of protection need not exceed six years and 75 days. Reviewing courts should defer to an agency's interpretation of its own regulations unless it is "plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). The Commission's reading of *Mendocino's* make-whole provision certainly crosses this low threshold.

In reaching this conclusion we do not rely on the Commission's reasoning, *see April 2, 1991 Decision* at 12–13, that a contrary reading would provide rail labor with incentives to drag the bargaining process out as long as possible in order to extend the cumulative length of benefit protection. The converse argument seems to us to apply with equal force to the Commission's rendition of the provision. Under that version, it may be that rail management has every incentive to draw out the process and thereby diminish the value of the protective benefits to the employees. Because the leases had already been approved, and the railroads were operating through their new structure, there would seem to be little reason here for rail management to push for the speedy resolution of the terms of the implementing agreement. Therefore, we wish to make clear that we affirm the Commission's reading of *Mendocino* based on the overall six-year and 75–day limit it enforces, without making any judgment about competing incentives for procrastination.

UTU's claim in this regard is that the benefits periods should have been contiguous. We agree with the Commission that UTU waived this argument. As noted above, the Commission consistently stated in this proceeding that it would defer to the agreement of the parties about the starting date of the benefit protective period. Until after the Harris Award was affirmed, all parties apparently had agreed at each stage that the protective period would commence on the effective date of the implementing agreement. UTU advocated this timetable not only during the Kasher arbitration, at which point it appeared that an implementing agreement would be enforced relatively soon after the expiration of the 75–day make-whole period, but also during the Harris arbitration, when it had become clear that such a schedule, absent a prolongation of the make-whole period, would create a "gap" of at least two years. See *Harris Award* at 36.

UTU did argue, after the Commission's *April 2, 1991 Decision* had established that the make-whole period would be limited to 75 days, that the start of the benefit protective period should be pushed back to sometime in 1988. But the Commission rejected this argument and suggested that while UTU had been free to adopt the litigation strategy of pushing for delay in the start of the six-year period while the length of the make-whole period was in dispute, it could not change course once its gambit had failed. See *July 5, 1991 Decision* at 4–5. We agree with UTU that the Commission's intentions with regard to the

length of the make-whole period were not entirely clear until its April 1991 ruling. However, we do not think it would have been reasonable for the union, prior to that decision, to rely on the assumption that the Commission would resolve that uncertainty in favor of a make-whole period that stretched from the effectuation of the leases to the date of the implementing agreement. Absent such reliance, we agree with the Commission that it is not unfair to hold that the union had assumed the attendant risks of its litigating position.

The situation would be different, of course, if the regulatory scheme itself mandated that the two benefit protection periods be contiguous. Both RLEA and UTU argue that the benefits gap causes the protections provided in this transaction to fall below the minimum mandated by § 11347. We reject these claims. This court has held that the *Mendocino Coast* provisions satisfy the dictates of § 11347, *see Railway Labor Executives' Ass'n v. United States*, 675 F.2d 1248, 1256 (D.C.Cir.1982), and there is no indication in *Mendocino Coast* itself that the periods must be contiguous. Section 11347 explicitly requires that the Commission ensure that railroad employees not be "in a worse position related to their employment as a result of the transaction" for a period of four years "following the effective date of the final action of the Commission." 49 U.S.C. § 11347. The phrase "final action" refers here to the Commission's approval of the Harris Award and institution of the implementing agreement. This interpretation is consistent with the relevant jurisdictional statute, *see* 28 U.S.C. § 2342(5), and with the language of the former 49 U.S.C. § 5(2)(f), recodified in 1978 as § 11347, which had required that the four years of protection under a Commission-authorized implementing agreement extend from "the

effective date of such order." 49 U.S.C. § 5(2)(f) (1976). The recodification was not intended to produce any substantive changes in the meaning of § 5(2)(f). *See New York Dock Ry. v. United States*, 609 F.2d 83, 90 n. 3 (2d Cir.1979). Since the protective benefits period here extends for six years from the date of the Commission's final action, it fully satisfies the statutory mandate. We therefore hold that the Commission properly determined the dates and lengths of the protective periods.[8]

## VII. IMPLICATIONS OF NOVEMBER 1987 STRIKE

The railroads challenge the Commission's decision that the railroad employees did not forfeit their rights to protective benefits under *Mendocino Coast* and the two arbitration awards by virtue of their strike between November 1987 and June 1988. *See December 11, 1990 Decision*. Although the precise basis for the Commission's order is not easy to discern, our analysis reveals a Commission rationale that is sufficiently clear and cogent to warrant sustaining the order.

The railroads viewed the work stoppage as an illegal attempt to force them to renegotiate ST's collective bargaining agreement, and treated the employees' refusal to work as equivalent to resignation. When ST subsequently rehired the workers pursuant to the Kasher Award, it indicated that it was treating them as new hires.[9] Before the Commission the railroads claimed that the workers had forfeited their rights to *Mendocino Coast* labor protective benefits by virtue of their constructive resignation. This argument rested on the parallel Sections 5(c) and 6(d) of *Mendocino*, which dictate in relevant part that the provision of protective benefits "shall cease

---

8. RLEA's other challenges to the Commission's administration of the benefit protection scheme do not merit discussion, and we summarily affirm those Commission actions.

9. By contrast, the employees claimed that the strike was motivated by legitimate safety concerns. The legality of the strike is the subject of an entirely separate proceeding in Maine. An arbitration decision in favor of the employees

was vacated by a district court in June 1991. *See Springfield Terminal Ry. v. United Transp. Union*, 767 F.Supp. 333 (D.Me.1991). The parties inform us that a new arbitration is pending. In view of our disposition of this issue, we need not concern ourselves with the factual disputes surrounding the actual motivation for the strike and the legal status of the rehired employees.

prior to the expiration of the protective period in the event of the ... employee's resignation...." 354 I.C.C. at 612.[10]

The Commission rejected this argument in an opinion opaque in places and muddied by scattered references to special equities and unique factual circumstances. As we read the opinion, the decision actually rested on the resolution of two related questions of law. First, the Commission held that the forfeiture provisions in Sections 5(c) and 6(d) applied only after the protective period had commenced. The Commission separately held (and we affirm today in Section VI) that the protective period did not commence here until November 4, 1990, the effective date of the implementing agreement. This is several years after the resolution of the job dispute at issue. Therefore, even if the workers had resigned in November 1987 as a result of their job action, that event could have no effect on their eligibility for protective benefits under *Mendocino*. *See December 11, 1990 Decision* at 12 & nn. 24–26. Second, the Commission relied on a provision from its *February 19, 1988 Decision*, which first imposed the *Mendocino* conditions on this transaction, directing that any implementing agreement reached through arbitration:

> shall provide that the employees of the several GTI railroads as of the date of the first such transaction under 49 U.S.C. 1180.2(d)(3) shall not be deemed to have forfeited any rights or benefits as a consequence of decisions made prior to the development of such an implementing plan.

*February 19, 1988 Decision* at 10, 4 I.C.C.2d 322, 332. Both the Kasher and the Harris Awards echoed this provision in Section 4 of their respective decrees. The Commission concluded in its December 11, 1990, ruling that the strike was an "employment choice" made prior to the execution of the implementing agreement, and

thus could not affect the workers' rights to protective benefits under the agreement. *See December 11, 1990 Decision* at 13–14.[11]

The Commission's resolution of these two legal questions was well within bounds. The question of the applicability of Sections 5(c) and 6(d) of *Mendocino* is apparently an issue of first impression. While the forfeiture provisions might be read to apply to any resignation after the execution of a disputed transaction, the Commission's determination that they are effective only after the protective period has begun is entirely plausible. This interpretation ensures that the time during which the protective benefits are subject to forfeiture is congruent with the period of protection itself. Conversely, the reading urged by the railroads would produce the odd result that the workers were at risk of forfeiture during a period when their rights to the benefits—and the magnitude of those benefits—had not yet been fixed. When we extend substantial deference to the Commission's interpretations of the *Mendocino* provisions, as we must, we see enough to sustain the Commission's reading of Sections 5(c) and 6(d).

Likewise, the Commission's interpretation of the language of one of its previous orders in this proceeding is entitled to respect. Under the terms of the *February 19, 1988 Decision*, all affected employees were entitled to a new offer of employment once the implementing agreement became effective. Counsel for the railroads conceded at oral argument that this provision meant that the railroads were required to renew offers of employment—accompanied by the full panoply of labor protection benefits—to any employee who had voluntarily resigned between the time the leases were implemented and the effective date of the implementing agreement. Yet the railroads' argument for forfeiture is based on their contention that the striking workers

---

**10.** Section Five of the *Mendocino* provisions deals with displacement allowances; Section Six covers dismissal allowances. To the extent relevant to this appeal, subsections (c) and (d), respectively, contain identical forfeiture provisions.

**11.** We note that this interpretation of the December 11, 1990, decision comports with the Commission's oft-stated intention to resolve the strike issue solely on legal grounds, without the need for any additional factual inquiry or findings. *See December 11, 1990 Decision* at 6 n. 11, 9–10.

had constructively resigned. Even the railroads' own logic, therefore, suggests that the pre-agreement strike could not affect the workers' rights to employment and benefits under the implementing agreement. The railroads' fall-back position is that it is bad public policy to reward participants in an unlawful strike. This may be so (assuming, for the moment, that the strike was in fact unlawful), but we think that the Commission's contrary interpretation of the language of its February 19, 1988, decision was permissible.

Together, these two legal conclusions dictate the Commission's holding that the striking workers did not thereby forfeit their rights to labor protection benefits. The workers' rights to the protective benefits arose from the Commission's imposition of *Mendocino* provisions on this transaction and from the arbitrated implementing agreements adopted pursuant to those provisions. The legal conclusions upheld above mean that the express terms of each of those sources provided that the benefits conferred thereunder could not be forfeited by any employment action taken prior to the effective date of the implementing agreement. Because the strike was settled long before an implementing agreement finally took effect in this transaction, participation in the strike could not—as a matter of law—affect the workers' rights to protective benefits.

### VIII. CONCLUSION

We remand for the Commission to reconsider its *October 4, 1990* order affirming the Harris Award and related rulings in light of the· principles announced above. We do not, however, vacate the *October 4, 1990* order. While we do not address the Commission's rejection of the Kasher Award, we do not mean to suggest that the Commission could not adopt the Kasher Award on remand. Rather, the Commission is free on remand to adopt any award

meeting the requirements set forth in this opinion.[12] The Commission's *December 11, 1990* order holding that railway employees did not forfeit their right to protective benefits under *Mendocino Coast* by virtue of the work stoppage from November 1987 to June 1988 is affirmed.

*So ordered.*

---

**12.** Our decision that certain terms of the Harris Award must be reconsidered should not be read to create any new "gap" in the six-year protective period under *Mendocino Coast*. While UTU agreed that the protective period would commence when an implementing agreement was finally in place, UTU could not reasonably have foreseen that the validity of the implementing agreement would be in doubt at this late date. Accordingly, the Commission's order on remand ought not affect the duration or dates of the benefits protective period.