**AMERICAN TRAIN DISPATCHERS ASSOCIATION, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**CSX Transportation, Inc., Intervenor.**

**No. 92–1397.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 6, 1993.

Decided June 28, 1994.

Michael S. Wolly, Washington, DC, argued the cause, and filed the briefs, for petitioner. Erick J. Genser and Thomas A. Woodley entered appearances, for petitioner.

John J. McCarthy, Jr., Associate Gen. Counsel, Interstate Commerce Commission ("ICC"), Washington, DC, argued the cause, for respondents. With him on the brief, were Robert S. Burk, Gen. Counsel, and Henri F. Rush, Deputy Gen. Counsel, ICC, Washington, DC. Robert J. Wiggers, Atty., U.S. Dept. of Justice, Washington, DC, entered an appearance, for respondents.

William G. Mahoney, argued the cause, for movant-intervenor Railway Labor Executives' Ass'n. With him on the briefs, was John O'B. Clarke, Jr., Washington, DC.

James S. Whitehead, Chicago, IL, argued the cause, for intervenor CSX Transp., Inc. and amicus curiae National Ry. Labor Conference. With him on the brief, were Richard T. Conway, Ralph J. Moore, Jr., Washington, DC, and James D. Tomola, Jacksonville, FL.

Before WALD, BUCKLEY, and WILLIAMS, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

The American Train Dispatchers Association ("Union"), a union of railroad employees, petitions for review of an order of the Interstate Commerce Commission exempting CSX Transportation, Inc. ("CSXT") from provisions of the collective bargaining agreement ("CBA") between the Union and CSXT. Under its authority to oversee railway consolidations, the ICC granted the exemption as a follow-up to its 1980 approval of CSXT's acquisition of several railroads. The exemption allows CSXT to transfer train dispatching work performed by four employees at its Corbin, Kentucky, property to its facility in Jacksonville, Florida, where non-union management employees will absorb the work. The Union claims that the four union employees were entitled to follow their jobs to Jacksonville and that the work transfer was unnecessary and beyond the scope of the 1980 approval of CSXT's acquisitions.

We affirm the ICC's decision but rely on different grounds. The ICC failed to inquire whether the work transfer deprives the four employees of any "rights," "privileges," or "benefits" in the CBA, an inquiry required by our recent decision in *Railway Labor Executives' Ass'n v. United States*, 987 F.2d 806 (D.C.Cir.1993) ("*Executives*"). Because the Union has conceded that no rights, privileges, or benefits were infringed, however, we see no reason to remand. In addition, we agree with the Commission's determination that the work transfer stemmed from the 1980 approval of CSXT's acquisitions and was necessary to effectuate them.

## I. BACKGROUND

### A. Statutory Scheme

The railroad industry emerged from World War I in a precarious condition. *Norfolk & Western Ry. Co. v. Am. Train Dispatchers*, 499 U.S. 117, 118, 111 S.Ct. 1156, 1158, 113 L.Ed.2d 95 (1991). As a consequence, in 1920 Congress passed legislation to encourage railway consolidations that would enhance economy and efficiency in the industry. *Id.* at 118–21, 111 S.Ct. at 1158–59. In its current form, this policy appears in Chapter 113 of the Interstate Commerce Act ("ICA"),

which authorizes the ICC to examine, condition, and approve railway mergers and consolidations. 49 U.S.C. § 11301 *et seq.*

ICC approval of a consolidation frees railroad companies from various legal constraints. In particular, section 11341(a) of the ICA provides, in pertinent part:

> A carrier, corporation, or person participating in that approved or exempted transaction is exempt from the antitrust laws and from *all other law*, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or [sic] franchises acquired through the transaction.

49 U.S.C. § 11341(a) (emphasis added). In *Norfolk & Western*, the Court held that "the term 'all other law' in § 11341(a) includes any obstacle imposed by law," including "the substantive and remedial laws respecting enforcement of collective-bargaining agreements." 499 U.S. at 133, 111 S.Ct. at 1166. The Court declined to decide, however, the issue whether "the scope of the immunity provision [i.e., section 11341(a) ] is limited by § 11347, which conditions approval of a transaction on satisfaction of certain labor-protective conditions." *Id.* It is this issue that confronts us here.

Section 11347 is intended to insulate railroad workers from the jolts of the corporate restructuring sanctioned by the ICC. It provides:

> When a rail carrier is involved in a transaction for which approval is sought ... the [ICC] shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 405 of the Rail Passenger Service Act (45 U.S.C. [§] 565).

49 U.S.C. § 11347. This provision incorporates by reference two sets of standards. The first is "the terms imposed under this section before February 5, 1976." Before that date, the Washington Job Protection Agreement of 1936 ("WJPA") governed labor-management negotiations over workers' rights in railway consolidations. *CSX*

*Corp.—Control—Chessie Sys., Inc. and Seaboard Coast Line Indus., Inc.,* 6 I.C.C.2d 715, 732–33 (1990). In *Executives,* where section 11341(a) did not apply, we adopted the ICC's view that the history of negotiations under the WJPA shows "that arbitrators were authorized ... to make certain changes to CBAs." 987 F.2d at 813. Thus, we found that "it was reasonable for the Commission to interpret the reference in § 11347 to the pre–1976 terms as carrying forward into the present version of § 11347 its authority to change CBAs." *Id.*

We went on to note, however, that the second set of standards incorporated by reference in section 11347, section 405 of the Rail Passenger Service Act, limits the power to override CBAs. *Id.* at 813–14. Section 405 provides, in pertinent part:

(a) A railroad shall provide fair and equitable arrangements to protect the interests of employees....

(b) Such protective arrangements shall include ... such provisions as may be necessary for ... the preservation of *rights, privileges, and benefits* ... to such employees under existing collective-bargaining agreements....

45 U.S.C. § 565(a), (b) (emphasis added). Construing this language, we commented:

The statute clearly mandates that "rights, privileges, and benefits" afforded employees under existing CBAs be preserved. Unless, however, every word of every CBA were thought to establish a right, privilege, or benefit for labor—an obviously absurd proposition—§ 565 (and hence § 11347) does seem to contemplate that the ICC may modify a CBA.

*Executives,* 987 F.2d at 814 (footnotes omitted).

To implement section 11347, the ICC has devised a package of arbitration procedures and employee benefits, known as the *New York Dock* conditions, *see New York Dock Ry.—Control—Brooklyn E. Dist. Terminal,* 360 I.C.C. 60, 84–90 (1979), *aff'd sub nom. New York Dock Ry. v. United States,* 609 F.2d 83 (2d Cir.1979), that apply to most types of railway transactions. Among other things, the *New York Dock* conditions require the rail carrier to compensate dislocated employees who cannot find other work or whose replacement jobs pay lower wages. 360 I.C.C. at 86–89.

In addition, section 4 of the conditions provides, in pertinent part:

Each transaction which may result in a dismissal or displacement of employees or rearrangement of forces, shall provide for the selection of forces from all employees involved on a basis accepted as appropriate for application in the particular case and any assignment of employees made necessary by the transaction shall be made on the basis of an agreement or decision under this section 4. If at the end of thirty (30) days there is a failure to agree, either party to the dispute may submit it [to arbitration].

360 I.C.C. at 85.

## B. Factual and Procedural History

In 1980, the ICC approved the first of a series of mergers and acquisitions that enabled CSXT to expand its rail capacity. *See CSX Corp.—Control—Chessie Sys., Inc. and Seaboard Coast Line Indus., Inc.,* 363 I.C.C. 521 (1980), *aff'd sub nom. Bhd. of Maintenance of Way Employees v. ICC,* 698 F.2d 315 (7th Cir.1983). Among others, CSXT acquired the Louisville & Nashville Railroad, including its property in Corbin, Kentucky. Twenty-two train dispatchers worked at the Corbin facility, all members of the Union. CSXT was bound by the CBA between the Union and the Louisville & Nashville Railroad.

In 1987, CSXT proposed to centralize all train dispatching activities for locomotives, known as "power distribution," at its property in Jacksonville, Florida. On January 9, 1988, CSXT and the Union agreed on the details for shifting dispatching operations from Corbin to Jacksonville. In accordance with *New York Dock,* the agreement provided for compensation and other benefits for the affected Corbin employees.

The agreement, however, did not cover four employees who held the rank of "Assistant Chief/Power." The CBA's "scope" provision defined the duties of these four employees to include

the movement of trains on a Division or other assigned territory, involving the su-

pervision of train dispatchers and other similar employees; to supervise the handling of trains and the distribution of power and equipment incident thereto; and to perform related work.

Petitioner's Appendix at 13. In the railroad industry, "scope provisions ... commonly are regarded as defining jurisdiction and job 'ownership' which prohibit the transfer of work from employees under one agreement to employees—even in the same craft—under another rules agreement." *Southern Ry. Sys. and Am. Ry. Supervisors Ass'n*, WJPA Docket No. 141 (1966), *quoted in CSX Corp.—Control—Chessie Sys., Inc., and Seaboard Coast Line Indus., Inc.*, 6 I.C.C.2d at 734.

On February 12, 1988, CSXT notified the Union that it would abolish the four Assistant Chief/Power positions and that non-union, management personnel in Jacksonville would assume the dispatching work. The Union objected and claimed that the CBA entitled the four employees to follow their jobs to Jacksonville. Pursuant to section 4 of *New York Dock*, the parties submitted their dispute to arbitration.

The arbitrator approved CSXT's transfer of the dispatching work of the four Assistant Chiefs/Power to Jacksonville and ruled that the four employees were limited to the same *New York Dock* benefits that the other Corbin dispatchers had received. On September 15, 1989, the ICC affirmed. *CSX Corp.—Control—Chessie Sys., Inc. and Seaboard Coast Line Indus., Inc.*, Finance Docket No. 28905 (Sub–No. 23).

The ICC rejected the Union's argument that the arbitrator lacked the power to modify the CBA between the Union and CSXT in order to permit the work transfer. *Id.* at 4. Relying implicitly on its authority to fashion labor-protective conditions under section 11347, the ICC asserted that the history of arbitration under *New York Dock* and its precursor, the WJPA, showed that arbitrators could override CBA provisions to the extent necessary to allow the rail company to carry out an approved transaction. *Id.* at 5–6.

The Union petitioned for review in this court; but before briefing, the Supreme Court handed down the *Norfolk & Western* decision, which ruled that section 11341(a) empowers the ICC to override CBA provisions. Because the *Norfolk & Western* Court reserved several questions, including whether section 11347 limited the ICC's override authority, we remanded the petition, along with three other cases, to let the ICC address the issues remaining after the Supreme Court's decision.

The three other cases, in which public comments have been solicited, are still before the ICC. *See CSX Corp.—Control—Chessie Sys., Inc. and Seaboard Coast Line Indus., Inc.*, 1992 WL 336045, 1992 I.C.C. LEXIS 233 (Nov. 3, 1992). In the instant case, however, the ICC did not invite comments from the public or further submissions from the parties; and on August 13, 1992, the Commission reaffirmed its 1989 decision approving CSXT's transfer of the dispatching work to Jacksonville. *CSX Corp.—Control—Chessie Sys., Inc., and Seaboard Coast Line Indus., Inc.*, 8 I.C.C.2d 715 (1992). Instead of invoking section 11347 and the history of *New York Dock* arbitration, however, the 1992 ruling rests solely on the ICC's authority to modify CBAs under section 11341(a). *Id.* at 718. For example, the decision notes:

> While the arbitrator ruled against the union, he did not specify whether he was doing so because: (1) there was no impediment preventing the transfer of work or (2) there was an existing impediment (due to an existing contract or the [Railway Labor Act] or both) but that it was necessary to override the obstacle(s).... We will assume that either the existing contract or the RLA or both, would have barred the transfer unless some other provision of law overrode the barrier(s).
>
> In light of [*Norfolk & Western*], there is no longer any dispute that under § 11341(a) the Commission may exempt approved transactions from certain laws, such as the RLA and collective bargaining agreements ... that would prevent the transactions from being carried out.

*Id.* at 720.

## II. DISCUSSION

We must first dispose of a motion to intervene in support of the petition to review filed

by the Railway Labor Executives' Association ("RLEA"), a voluntary, unincorporated association of the chief executive officers of the major rail labor unions. CSXT urges us to deny the motion because RLEA did not participate in the proceeding before the ICC. The statute that governs our review of ICC orders provides, in pertinent part:

> The agency, and any party in interest in the proceeding before the agency whose interests will be affected if an order of the agency is or is not enjoined, set aside, or suspended, may appear as parties thereto of their own motion and as of right.... Communities, associations, corporations, firms, and individuals, whose interests are affected by the order of the agency, may intervene in any proceeding to review the order.

28 U.S.C. § 2348 (1988). This provision, which was enacted in 1966, Pub.L. No. 89–554, 80 Stat. 623 (1966), is virtually identical to its predecessor in the Judicial Review Act of 1950.

■ We construed the predecessor provision in *Montship Lines, Ltd. v. Fed. Maritime Bd.,* 295 F.2d 147 (D.C.Cir.1961), where we held that "'parties in interest in the proceeding before the agency'" could intervene as a matter of right and that, in addition, we had discretion to permit intervention by "parties 'whose interests are affected by the agency's order.'" *Id.* at 152 (quoting 5 U.S.C. § 1038 (repealed)). Thus, even assuming that RLEA is not entitled to intervene as of right here, we may allow it to intervene as a discretionary matter. We choose to do so in this case because of RLEA's undisputed assertion that our decision will have strong precedential impact on three cases pending before the Commission in which it has submitted comments. If RLEA is not permitted to intervene here, its ability to protect its interests in the underlying proceeding may be impaired. *Cf. Nuesse v. Camp,* 385 F.2d 694, 701 (D.C.Cir.1967) (noting that under Fed.R.Civ.Proc. 24(a), "*stare decisis* principles may in some cases supply the practical disadvantage that warrants intervention as of right" and permitting state banking commissioner to intervene in case of first impression, because "the first

judicial treatment of this question[ ] would receive great weight"); *see also Auto Workers v. Scofield,* 382 U.S. 205, 217 n. 10, 86 S.Ct. 373, 381 n. 10, 15 L.Ed.2d 272 (1965) ("The Federal Rules of Civil Procedure, of course, apply only in the federal district courts. Still, the policies underlying intervention may be applicable in appellate courts.").

CSXT also contends that RLEA lacks Article III standing to intervene. We need not address this argument because RLEA raises the same issues as the Union, which plainly has standing to champion the interests of the four Corbin employees, who are all Union members. *See Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 342–43, 97 S.Ct. 2434, 2440–41, 53 L.Ed.2d 383 (1977). "[I]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case." *Executives,* 987 F.2d at 810 (likewise pretermitting issue of RLEA's standing where all but one of its arguments matched those of petitioner who had standing); *see also Railway Labor Executives' Ass'n v. ICC,* 999 F.2d 574, 577 n. 5 (D.C.Cir.1993) (same). Accordingly, we grant RLEA's motion to intervene without deciding whether it has Article III standing.

Turning to the merits, we confront the issue reserved by the Supreme Court in *Norfolk & Western:* What restraints, if any, does section 11347 impose on the ICC's authority under section 11341(a) to override CBA provisions? In *Executives,* we held that section 11347 shields those CBA provisions that create "rights, privileges, and benefits" from the ICC's override power. Although section 11341(a) did not apply to the transaction before us in that case—a lease of rail lines and trackage rights—, 987 F.2d at 813, we did not restrict our interpretation of section 11347 to that particular type of transaction. Indeed, section 11347 does not admit of any such limitation; it applies to leases, consolidations, mergers, acquisitions, and various other types of railway transactions, including the work transfer in this case. *See* 49 U.S.C. §§ 11347, 11344, 11345, 11346; *see also* 987 F.2d at 813. Thus, our holding in *Executives*

applies with full force where, as here, sections 11341(a) and 11347 overlap.

In *Executives,* we remanded to let the ICC define the "rights, privileges, and benefits" language of section 405 of the Rail Passenger Service Act and determine if the CBA provisions involved in that case—rates of pay, rules, and working conditions—came under the protection of that statutory rubric. 987 F.2d at 814. The ICC has not yet rendered a ruling in the remanded proceeding. In the instant case, the ICC's 1992 decision issued seven months before *Executives* and does not address whether the transfer of dispatching work treads upon any rights, privileges, or benefits in the CBA. Indeed, the decision relies exclusively on section 11341(a) for override authority and declines even to consider whether there are any specific CBA impediments to the work transfer. 8 I.C.C.2d at 720. Nor can the ICC fall back on its discussion of section 11347 in the 1989 decision because that decision concludes that arbitrators may annul *any* CBA provision that blocks a rail consolidation, a view that conflicts with the *Executives* holding that certain contractual provisions are immutable. 987 F.2d at 814.

 Unlike the *Executives* court, however, we need not remand because it is clear that the work transfer infringes no "rights, privileges, [or] benefits" in the CBA. A remand is unnecessary where, as here, the outcome of a new administrative proceeding is preordained. *See NLRB v. Wyman–Gordon,* 394 U.S. 759, 766–67 n. 6, 89 S.Ct. 1426, 1429–30, 22 L.Ed.2d 709 (1969) ("[i]t would be meaningless to remand" where "[t]here is not the slightest uncertainty as to the outcome of a[n] [agency] proceeding"); *D.C. Fed'n of Civic Ass'ns v. Volpe,* 459 F.2d 1231, 1247 n. 84 (D.C.Cir.1972) ("we agree that a remand would be academic if the agency would inevitably arrive at the same result").

At oral argument, the Union's counsel conceded that *New York Dock* empowers arbitrators to override scope provisions in CBAs; by implication, he admitted that the scope clause assigning power distribution work at Corbin to the Assistant Chiefs/Power did not create any "rights, privileges [or] benefits." He insisted, however, that the arbitrator exceeded his authority by stripping the employees of a contractual "right" to bid on the work in Jacksonville.

But in a brief filed after oral argument, CSXT denied that the four employees had a right under the CBA to bid on vacant positions in Jacksonville and asserted that the only CBA provision overridden by the arbitrator was the scope clause. Although the Union filed a brief responding to CSXT's post-argument submission, it does not challenge these statements. Instead, the Union argues that section 4 of the *New York Dock* conditions entitles the four employees to follow their work to Jacksonville. Section 4 requires that "[e]ach transaction which may result in a dismissal or displacement of employees ... provide for the selection of forces from all employees involved on a basis accepted as appropriate for application in the particular case...." 360 I.C.C. at 85. The Union charges that the arbitrator violated this provision by failing to select employees from both Jacksonville and Corbin to perform the transferred work.

We disagree. Section 4 does not provide a formula for apportioning the "selection of forces." Instead, it frees the hand of the arbitrator to fashion a solution that is "appropriate for application in the particular case." In this case, existing management employees will absorb the transferred work; CSXT does not need additional workers. We thus cannot say that the arbitrator abused his discretion by selecting forces solely from Jacksonville. *See, Chicago & North Western Transp. Co.—Abandonment,* 3 I.C.C.2d 729, 736 (1987) (ICC accords substantial deference to arbitrators' decisions on issues of causation, calculation of benefits, and factual questions), *aff'd sub. nom. Int'l Bhd. of Elec. Workers v. ICC,* 862 F.2d 330 (D.C.Cir.1988). As the work transfer impinges on no "rights, privileges, [or] benefits" in the CBA, it satisfies section 11347.

We turn next to the ICC's application of section 11341(a). Section 11341(a) exempts "approved ... transaction[s] ... from the antitrust laws and from all other law ... as necessary to let [the railway] carry out the transaction." 49 U.S.C. § 11341(a). In *Norfolk & Western,* the Supreme Court reserved

the questions whether the action challenged in that case—the carrier's proposed consolidation of locomotive dispatching functions in the wake of an acquisition approved by the ICC—was "necessary" to implement the acquisition and whether it was part of the original "approved transaction." 499 U.S. at 125, 134, 111 S.Ct. at 1162–63, 1166.

Continuing where *Norfolk & Western* left off, the ICC in its 1992 decision focused on the "necessity" and "approved transaction" predicates of section 11341(a). It decided that "the 'necessity' predicate is satisfied by a finding that some 'law' (whether antitrust, [the Railway Labor Act], or a collective bargaining agreement formed pursuant to the [Railway Labor Act]) is an impediment to the approved transaction." *CSX Corp.— Control—Chessie Sys., Inc., and Seaboard Coast Line Indus., Inc.,* 8 I.C.C.2d at 721. Thus, it ruled, CSXT was "exempted from any provisions of the collective bargaining agreements ... that might bar the immediate consummation of the transfer of dispatching functions." *Id.* at 723. Addressing the "approved transaction" language, it concluded that "[t]he approval of a principal transaction extends to and encompasses subsequent transactions that are directly related to and fulfill the purposes of the principal transaction," *id.* at 722, and thus that the transfer of power distribution work flowed from the 1980 approval of CSXT's acquisitions. *Id.* at 720.

In its opening salvo against these findings, the Union contends that the ICC lacks jurisdiction to determine whether a transaction is "necessary" or whether it is incident to the original "approved transaction." The Union's only real ammunition, however, is a single sentence in a footnote in Justice Stevens' concurrence in *Interstate Commerce Comm'n v. Bhd. of Locomotive Eng'rs,* 482 U.S. 270, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987): "The idea of having parties repeatedly return to the ICC for decisions on the necessity of an exemption is without basis in the statutory scheme, and would clearly not mitigate the delay and confusion surrounding consolidations." *Id.* at 300 n. 14, 107 S.Ct. at 2377 n. 14.

This sentence is somewhat ambiguous because Justice Stevens also notes that "[a]ny tribunal that is faced with a claim that a party is violating some 'other law' has the responsibility of determining whether an exemption is 'necessary ...,'" *id.* at 300 n. 13, 107 S.Ct. at 2377 n. 13, and because his main point is that the ICC is not *required* to make a "necessity" finding when it approves the *original* transaction. *Id.* at 295–98, 107 S.Ct. at 2374–76.

▪ In any event, we made clear in *Railway Labor Executives' Ass'n v. ICC,* 883 F.2d 1079 (D.C.Cir.1989), *modified on other grounds and reh'g denied,* 929 F.2d 742 (D.C.Cir.1991), that "the ICC may consider a question of exemption, and make the 'necessity' determination [under section 11341(a)], when the issue is properly before it." *Id.* at 1082. We can discern no reason why the ICC should not have equal authority to make the "approved transaction" determination. A recent Ninth Circuit decision supports our view that the ICC has jurisdiction to make such findings. *See Railway Labor Executives' Ass'n v. Southern Pac. Transp. Co.,* 7 F.3d 902, 906 (9th Cir.1993) (ICC has exclusive authority to clarify scope of merger approvals and determine necessity under section 11341(a)), *cert. denied,* —— U.S. ——, 114 S.Ct. 1298, 127 L.Ed.2d 650 (1994).

The Union next attacks the ICC's necessity finding on the merits, arguing that the four Corbin employees were capable of performing the work in Jacksonville and that there was thus no need to give it to nonunion employees. The argument misapprehends the standard for necessity. In *Executives,* we held that to satisfy the "necessity" predicate for overriding a CBA, the ICC must find that the underlying transaction yields a transportation benefit to the public, "not merely [a] transfer [of] wealth from employees to their employer." 987 F.2d at 815. In other words, the benefit cannot arise from the CBA modification itself; considered independently of the CBA, the transaction must yield enhanced efficiency, greater safety, or some other gain.

Technically, *Executives* articulated the necessity standard for section 11347 rather than section 11341(a), which did not apply in

that case. Both provisions apply here, however, and because section 11347 "on its face provides more, not less, generous labor protection than does § 11341(a)," 987 F.2d at 814, we need not decide if a different standard would suit a case where section 11341(a) applied but section 11347 did not.

■ In light of *Executives*, the ICC's assertion in its 1992 decision that "the 'necessity' predicate is satisfied" whenever a CBA is "an impediment" to a transaction clearly misstates the necessity standard. Nonetheless, the record reveals transportation benefits from CSXT's proposed work consolidation sufficient to pass the *Executives* test; thus a remand is unnecessary. *See Wyman–Gordon,* 394 U.S. at 766–67 n. 6, 89 S.Ct. at 1429–30 n. 6. As the ICC's decision notes, the arbitrator found that centralizing power distribution functions at a single location would facilitate power allocation decisions for CSXT's far-flung rail network. The arbitrator also found that CSXT had employed non-union power distribution dispatchers in Jacksonville "for a long time," which belied any suggestion that CSXT was seeking the transfer to usurp union work; indeed, he dismissed the specter that CSXT was engaging in "union busting." Thus, the work transfer was "necessary," for it yielded transportation efficiencies and was not aimed solely at abrogating a CBA provision.

Finally, the Union assails the ICC's ruling that the work transfer was incident to the "approved transaction"—CSXT's 1980 acquisitions—under section 11341(a). The Union contends that the ICC's definition of "approved transaction" is overbroad and that the Commission never envisioned a transfer of work from union to non-union employees when it approved CSXT's acquisitions in 1980.

■ We find reasonable the ICC's view that the section 11341(a) exemption for "approved ... transaction[s]" extends to subsidiary transactions that fulfill the purposes of the main control transaction. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984) (court may not substitute its own construction of ambiguous statutory provision for reasonable interpretation by agency where agency is entrusted to administer statute). The *New York Dock* conditions define "transaction" as "any action taken pursuant to authorizations of this Commission on which these provisions have been imposed." 360 I.C.C. at 84 (Art. I, § 1(a)). The ICC adopted this definition at the urging of labor unions, who insisted that labor protections must extend not only to workers displaced by the main control transaction but also to those displaced by later, related restructurings. *Id.* at 65. Heeding this plea, the ICC noted: "[T]he broad definition [of 'transaction'] is necessary in the types of transactions for which approval is required under 49 U.S.C. [§] 11343 *et seq.,* because the event actually affecting the employees might occur at a later date than the initial transaction, yet still pursuant to our approval...." *Id.* at 70. The ICC's elastic construction of "approved transaction" in this case mirrors this settled understanding.

Moreover, the ICC's 1980 approval of CSXT's acquisitions contemplated the possibility of future worker dislocations: "It is certainly possible that as the two systems mesh their operations, additional coordinations may occur that could lead to further employee displacements." *CSX Corp.—Control—Chessie Sys., Inc., and Seaboard Coast Line Indus., Inc.,* 363 I.C.C. at 589. Despite these potential disruptions, the ICC approved the deal, noting that "[w]e believe that [the *New York Dock* conditions] will adequately protect those employees now identified as affected by the consolidation as well as those who may be affected in the future, but are not now identified specifically." *Id.*

We have no reason to believe that the work transfer in this case is anything but one of the "additional coordinations" the ICC had in mind. Indeed, as the ICC's 1992 decision notes, "coordination of locomotive power is precisely the type of action that might reasonably be expected to flow from the [1980] control transaction," *CSX Corp.—Control—Chessie Sys., Inc., and Seaboard Coast Line Indus., Inc.,* 8 I.C.C.2d at 724 (internal quotation marks omitted), because the very point of many mergers is to capture efficiencies from centralization of function. Finally, con-

sistent with its 1980 approval, the ICC granted *New York Dock* benefits to the four Assistant Chiefs/Power in both its 1989 and 1992 decisions.

### III. CONCLUSION

Although *Executives* has superseded some of the language in the ICC's decision, we deny the petition for review because the ICC clearly had the authority to approve the work transfer and because the transfer was necessary and incident to CSXT's 1980 acquisitions.

*So ordered.*