**UNITED TRANSPORTATION UNION and Brotherhood of Locomotive Engineers, Petitioners,**

v.

**SURFACE TRANSPORTATION BOARD and United States of America, Respondents,**

**Railway Labor Executives' Association, et al., Intervenors.**

No. 95–1621.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 4, 1997.

Decided March 21, 1997.

William G. Mahoney, Washington, DC, argued the cause for petitioners, with whom John O'B. Clarke, Jr. and Richard S. Edelman were on the briefs.

Louis Mackall, V, Attorney, Surface Transportation Board, Washington, DC, argued the cause for respondents, with whom Henri F. Rush, General Counsel, was on the brief. John J. Powers, III and Robert J. Wiggers, Attorneys, U.S. Department of Justice, entered appearances.

Ronald M. Johnson argued the cause and filed the brief for intervenor CSX Transportation, Inc.

Jeffrey S. Berlin, Mark E. Martin, Robert W. Blanchette, Washington, DC, and Kenneth P. Kolson, Vienna, VA, were on the brief for amicus curiae Association of American Railroads.

Before: EDWARDS, Chief Judge, HENDERSON and ROGERS, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

HARRY T. EDWARDS, Chief Judge:

This case arises out of an effort by CSX Transportation, Inc. ("CSXT") to implement an approved merger of operations of portions of four former railroads into a new, consolidated rail district. In so doing, CSXT sought to abrogate terms of existing collective bargaining agreements ("CBAs") in order to merge separate seniority rosters from the former railways into single seniority lists for engineers and trainmen for the entire district and to place the employees of the consolidated district under one CBA. CSXT served notice on the United Transportation Union ("UTU") and the Brotherhood of Locomotive Engineers ("BLE") (jointly, "unions") of its intent to consolidate the various seniority districts. After negotiations between CSXT and the unions failed to produce an agreement implementing the proposed changes, the dispute was referred to arbitration. The arbitrator ruled in favor of CSXT, holding that the proposed changes are necessary to effectuate a transaction approved by the Interstate Commerce Commission ("ICC"); however, in light of this court's decision in *Railway Labor Executives' Ass'n v. United States*, 987 F.2d 806, 814 (D.C.Cir. 1993) (*Executives*), the arbitrator reserved for the Commission the question whether CSXT's proposed changes undermine "rights, privileges, and benefits" protected by 49 U.S.C. § 11347 and the so-called "*New York Dock* rules." *See New York Dock Ry.–Control–Brooklyn E. Dist. Terminal*, 360 I.C.C. 60, *aff'd sub nom. New York Dock Ry. v. United States*, 609 F.2d 83 (2d Cir.1979) (*New York Dock*).

Section 11347 incorporates the protections of the Rail Passenger Service Act, 45 U.S.C. § 565, which provides that, in transactions (such as railway consolidations) approved by the Commission,

protective arrangements shall include ... such provisions as may be necessary for

... the preservation of rights, privileges, and benefits ... under existing collective bargaining agreements....

However, the Supreme Court and this court have made it clear that the ICC may abrogate certain terms of a CBA as necessary to effectuate an ICC-approved transaction. *See Norfolk & W. Ry. Co. v. American Train Dispatchers Ass'n,* 499 U.S. 117, 127–28, 111 S.Ct. 1156, 1162–63, 113 L.Ed.2d 95 (1991) (*Dispatchers); American Train Dispatchers Ass'n v. ICC,* 26 F.3d 1157, 1163–64 (D.C.Cir. 1994) (*ATDA); Executives,* 987 F.2d at 814. The questions at issue here are (1) whether established seniority provisions are within the category of interests that are subject to abrogation, and, if so, (2) whether the changes proposed by CSXT are *necessary* to effectuate the consolidation of railway operations that had been approved by the ICC. The Commission answered affirmatively to each of these questions, and we can find no error in the agency's judgment.

The principal dispute in this case is over the meaning of "rights, privileges, and benefits," for the parties agree that any employment arrangement meeting this definition is fully protected, save for modifications achieved through collective bargaining. The Commission held that "the term 'rights, privileges, and benefits' means the 'so-called incidents of employment, or fringe benefits' ... and does not include scope or seniority provisions." *CSX Corp.—Control—Chessie Sys., Inc. and Seaboard Coast Line Indus., Inc.,* Finance Docket No. 28905 (Sub–No. 27) (Nov. 22, 1995) (*Commission decision),* reprinted in Joint Appendix ("J.A.") 238. In light of the applicable statutory provisions and the judicial decisions construing them, we can find no basis to overturn the Commission's holding on this point.

Furthermore, the Commission did not err in upholding the arbitrator's finding that CSXT's proposed changes are *necessary* to effectuate an ICC-approved consolidation. The ICC found that "merging the separate seniority rosters into one will produce real efficiency benefits," *see id.* at 13, *reprinted in* J.A. 236, thus making clear the nexus between the proposed changes and the effectuation of an approved transaction found to be in the public interest.

On the record at hand, the petition for review must be denied.

## I. BACKGROUND

CSXT, a major rail carrier, is the product of various railroad mergers, all approved by the ICC.[1] CSXT had its genesis in the ICC's 1980 decision authorizing CSX Corporation to control two railroad holding companies. *See CSX Corp.—Control—Chessie Sys., Inc. and Seaboard Coast Line Indus., Inc.,* 363 I.C.C. 521 (1980) (*CSX Control).* Over time, the operations of the railroad subsidiaries of Chessie System, Inc. ("Chessie") and Seaboard Coast Line Industries, Inc. ("SCLI") were merged together and, ultimately, became CSXT. CSXT has combined various operations, facilities, and workforces throughout portions of the former railroads that today constitute CSXT.

This case arises out of an attempt by CSXT to consolidate train operations, workforces, and facilities on portions of four former railroads—the Baltimore and Ohio Railroad("B&O"), Western Maryland Railway ("WM"), Chesapeake and Ohio Railway ("C&O"), and Richmond, Fredericksburg and Potomac Railway ("RF&P"). In 1993, CSXT decided to combine train operations, workforces, and facilities on the eastern portion of the former B&O with contiguous portions of the former RF&P, WM, and C&O to create the Eastern B&O Consolidated District. CSXT proposed to place all of the train crew employees working in the new, consolidated district on merged seniority rosters, with one

---

1. The ICC is the predecessor to the Surface Transportation Board ("STB"). Effective January 1, 1996, the Interstate Commerce Act ("ICA") was amended by the ICC Termination Act, thereby transferring all of the ICC's remaining functions to the STB. *See* Pub.L. No. 104–88, 109 Stat. 803 (1995). A savings clause in the Termination Act, § 204, provides that matters arising before January 1, 1996 will continue to be governed by the ICA as it existed pre-amendment. We, therefore, will refer to the pre-amendment ICA. We note that §§ 11341(a) and 11347 of the ICA were continued by the ICC Termination Act, but were renumbered, respectively, as §§ 11321(a) and 11326.

list for engineers and a separate list for trainmen.

At the time when the disputed proposals were advanced, CSXT had CBAs with the UTU and BLE covering each of the former railroads constituting the new district. The seniority rules in the CBA for each railroad generally required that work in that geographic region be performed by employees with seniority rights under that agreement. Under CSXT's proposed implementation plan for its consolidation of operations in the Eastern B&O District, CSXT could use any engineer or trainman to staff a train throughout the consolidated district, regardless of whether the territory was within the boundaries of the employee's railroad prior to consolidation.

On January 10, 1994, pursuant to Commission-mandated procedures under section 4 of the *New York Dock* rules, *see New York Dock*, 360 I.C.C. at 77, CSXT served notice on the unions of its intent to consolidate various seniority districts of its affiliate carriers. The unions refused to negotiate an implementing agreement concerning these changes. Because the unions and CSXT could not reach an agreement, the matter was referred to arbitration as required by section 4 of the *New York Dock* rules, *see New York Dock*, 360 I.C.C. at 78.

A neutral arbitrator found (1) that the coordination proposed by CSXT was linked to an ICC-approved transaction; (2) that *New York Dock* arbitration was not barred by the terms of prior implementing agreements that made reference to Railway Labor Act ("RLA") bargaining; (3) that CSXT had shown that modification of existing CBAs was necessary; and (4) that the proposed changes to the existing CBAs could be made, provided, as required by section 2 of *New York Dock* rules implementing 49 U.S.C. § 11347, they did not undermine protected "rights, privileges, and benefits." *See UTU v. CSX Transp., Inc.,* (Apr. 21, 1995) (O'Brien, Arb.), *reprinted in* Supplemental Appendix ("S.A.") 413. The arbitrator, in light of this court's decision in *Executives,* 987 F.2d at 814 (leaving for the Commission to determine in the first instance the scope of protected "rights, privileges, and benefits"),

reserved for the Commission the question whether CSXT's proposed changes to the CBAs undermine protected "rights, privileges, and benefits." *See UTU v. CSX Transp., Inc.,* (Apr. 21, 1995) (O'Brien, Arb.), *reprinted in* S.A. 413.

The unions petitioned the Commission to review and reverse the arbitrator's decision, *see* Petition of UTU and BLE, *CSX Corp.—Control—Chessie System, Inc. and Seaboard Coast Line Indus., Inc.,* Finance Docket No. 28905 (Sub–No. 27) (June 9, 1995), *reprinted in* J.A. 33, while CSXT requested the Commission to uphold the arbitrator's findings and, further, to find that CSXT's proposed changes to the CBAs did not undermine protected "rights, privileges, and benefits," *see* Petition of CSXT, *CSXT—Bhd. of Locomotive Eng'rs and United Transp. Union,* Finance Docket No. 28905 (Sub–No. 27) (June 9, 1995), *reprinted in* J.A. 7.

The Commission ruled in favor of CSXT. *See Commission decision, reprinted in* J.A. 224–41. First, the ICC sustained the arbitrator's finding that CSXT's proposed coordination of train operations in the new, consolidated B&O Eastern District was linked to ICC-approved merger and control transactions. *See id.* at 8, *reprinted in* J.A. 231. Second, the Commission upheld the arbitrator's finding that prior implementing agreements of CSXT do not require that CSXT accomplish the coordination at issue here through Railway Labor Act ("RLA") bargaining procedures, as CSXT's proposed changes involve a different (*i.e.,* greater) territory than that to which the prior agreements applied. *See id.* at 10–12, *reprinted in* J.A. 233–35. The Commission also found that applying *New York Dock* rules in the instant case comports with the parties' prior implementing agreements. On several occasions, CSXT has consolidated operations within the territory of the former railroads and, without objection from the unions, applied *New York Dock* rules. *See id.* Third, the Commission found that CSXT's proposed changes to seniority rights as established by CBAs were necessary to effectuate the ICC-approved transaction. The ICC also found that CSXT's proposed changes are not a device to transfer wealth from the employees

to the railroad, and that the merging of the separate seniority districts will produce real efficiency benefits. *See id.* at 13, *reprinted in* J.A. 236. Finally, the ICC determined that CSXT's proposed changes do not involve "rights, privileges, and benefits" that are protected by 49 U.S.C. § 11347 and section 2 of the *New York Dock* rules. The Commission noted that "rights, privileges, and benefits" include only "the incidents of employment, ancillary emoluments or fringe benefits." *See id.* at 14, *reprinted in* J.A. 237. The Commission concluded that the CBA provisions at issue in this case do not fall within the protected "rights, privileges, or benefits," as they involve scope and seniority changes of the type that consistently have been modified in the past in connection with consolidations. *See id.* at 15, *reprinted in* J.A. 238.

On January 4, 1996, the STB denied the unions' petition for an administrative stay. The unions then filed a petition for review in this court.

## II. ANALYSIS

The Supreme Court has made clear that, to effectuate an ICC-approved transaction, 49 U.S.C. § 11341(a) (1994) allows for the abrogation of terms in a CBA. *See Dispatchers*, 499 U.S. at 127–28, 111 S.Ct. at 1162–63.[2] In this court's *Executives* decision, however, we pointed out that "§ 11347 [involving 'employee protective arrangements in transactions involving rail carriers'] on its face provides more, not less, generous labor protection than does § 11341(a)." 987 F.2d at 814. Thus, the court found that, with respect to transactions covered by section 11347, "the Commission may not modify a CBA willy-nilly." *Id.* Nonetheless, the *Executives* decision is clear in recognizing that

the Commission may modify CBAs as necessary to effectuate covered transactions:

> The statute clearly mandates that "rights, privileges, and benefits" afforded employees under existing CBAs be preserved. Unless, however, every word of every CBA were thought to establish a right, privilege, or benefit for labor—an obviously absurd proposition—§ 565 (and hence § 11347) does seem to contemplate that the ICC may modify a CBA.

*Id.* at 814 (footnotes omitted). Subsequently, in *ATDA*, the court construed *Executives* as holding that "certain contractual provisions," *i.e.*, those treading upon any rights, privileges, or benefits in a CBA, "are immutable." 26 F.3d at 1163.

In this case, we face two main issues—(1) whether CSXT's proposed seniority changes involve terms of a CBA that are shielded absolutely from the ICC's abrogation authority and, if not, (2) whether the proposed changes are "necessary" to effectuate an ICC-approved transaction.[3]

### A. *"Rights, Privileges, and Benefits"*

The unions argue that the Commission erred in finding that CSXT's proposed merger of the seniority rosters in the consolidated district would not undermine protected rights. We disagree.

When a proposed consolidation involves rail carriers, 49 U.S.C. § 11347 requires the Commission to impose labor-protective conditions on the transaction to ensure a "fair arrangement" that will safeguard the interests of adversely affected employees. *See Executives*, 987 F.2d at 813. In interpreting the safeguards required by § 11347, the Commission held in *New York Dock* that "[t]he rates of pay, rules, working conditions and all collective

---

**2.** Section 11341(a) provides, in relevant part, that a carrier in an approved consolidation "is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let [it] carry out the transaction." 49 U.S.C. § 11341(a) (1994).

**3.** In their briefs, the unions also contend that, under previous implementing agreements, CSXT was required to make any modifications to CBAs for the former railroads comprising the new consolidated district through RLA procedures. On the record at hand, we find nothing in this claim that gives us pause or that would deter us from deferring to the Commission's judgment.

We also note that, in a related case involving the same contract language at issue here (but a different consolidated district), a panel of this court is currently considering, and will address, whether the language requires application of RLA procedures. *See UTU v. STB*, No. 96–1201.

bargaining and *other rights, privileges, and benefits* ... under applicable laws and/or existing collective bargaining agreements ... shall be preserved unless changed by future collective bargaining agreements." 360 I.C.C. at 84 (emphasis added). In other words, CBA terms that establish "rights, privileges, and benefits" may not be abrogated outside of collective bargaining.[4] Up until now, this broad conceptual framework has been clear, but the scope of the rights at issue has defied comprehension. Obviously confused, the court in *Executives* remanded that case to the Commission to allow the agency to explain the meaning of the phrase "rights, privileges, and benefits." *See* 987 F.2d at 814.

In this case, the Commission offers a definition: "rights, privileges, and benefits" refers to "the incidents of employment, ancillary emoluments or fringe benefits—as opposed to the more central aspects of the work itself—pay, rules and working conditions." *See Commission decision* at 14, *reprinted in* J.A. 237. And "the incidents of employment, ancillary emoluments or fringe benefits" refers to employees' vested and accrued benefits, such as life insurance, hospitalization and medical care, sick leave, and similar benefits. *See id.* at 15, *reprinted in* J.A. 238. According to the Commission, seniority provisions are not within the compass of "rights, privileges, and benefits" protected absolutely from the Commission's abrogation authority. *See id.* On this point, the Commission notes that seniority provisions "have consistently been modified in the past in connection within [sic] consolidations. This may be due to the fact that almost all consolidations require scope and seniority changes in order to effectuate the purpose of the transaction. Railway Labor Act bargaining over these aspects of a consolidation would frustrate the transactions." *Id.*

The Commission's interpretation is reasonable. *See American Train Dispatchers Ass'n v. ICC,* 54 F.3d 842, 847–48 (D.C.Cir. 1995) (holding that the ICC's interpretation of *New York Dock* rules is entitled to sub-

stantial deference by a reviewing court). Under the Commission's interpretation, "rights, privileges and benefits" are protected absolutely, while other employee interests that are not inviolate are protected by a test of "necessity," pursuant to which there must be a showing of a nexus between the changes sought and the effectuation of an ICC-approved transaction. Under this scheme, the public interest in effectuating approved consolidations is ensured without any undue sacrifice of employee interests. In our view, this is exactly what was intended by Congress.

In this case, the only contested changes to the CBAs are seniority provisions covering the previously separate regions of rail service. When pressed at oral argument, the unions' counsel was forced to acknowledge that employees will lose no so-called "fringe benefits" by virtue of CSXT's proposed changes to the CBAs. Thus, the Commission committed no error in holding that CSXT's proposed changes do not undermine protected "rights, privileges, and benefits."

**B. Necessity**

We next turn to the question whether CSXT's proposed changes to the seniority rosters were *necessary* to effectuate an ICC-approved transaction. The unions contend that the Commission erred in finding a nexus. We disagree.

**1. Nexus Between Changes Sought and ICC–Approved Transaction**

It is undisputed that the Commission has, through a series of decisions, approved CSXT's proposed consolidation of the Chessie and Seaboard subsidiaries as being in the public interest. *See CSX Control,* 363 I.C.C. at 521. Petitioners, however, contend that the Commission erred by finding that there is a nexus between CSXT's proposed changes to the seniority rosters and the ICC-approved transaction. They argue simply that the passage of time between the ICC approval in *CSX Control* and the proposal for changes to the seniority rosters has rendered

---

4. No one has suggested that *seniority provisions* fall within the compass of "rates of pay, rules, working conditions" under *New York Dock,* so

the scope of this term is not an issue in this case. It is only the meaning of "other rights, privileges, and benefits" that is at issue.

the two events unrelated. This argument is meritless.

The record clearly supports the Commission's affirmance of the arbitrator's factual finding that the proposed changes are linked to an approved transaction. As the Commission noted, CSXT has consolidated its operations gradually, often waiting until corporate entities were merged. The Chessie and Seaboard Coast subsidiaries were not fully merged until 1992. On this record, we are satisfied that the passage of time does not diminish a causal connection. *See CSX Corp.—Control—Chessie Sys., Inc. and Seaboard Coast Line Indus.,* 8 I.C.C.2d 715, 724 n. 14 (1992), *aff'd sub nom. ATDA,* 26 F.3d at 1157.

### 2. Transportation Benefit

In *Executives,* we held that, in addition to finding a nexus between the proposed changes and an ICC-approved transaction, "to satisfy the 'necessity' predicate for overriding a CBA, the ICC must find that the underlying transaction yields a transportation benefit to the public, 'not merely [a] transfer [of] wealth from employees to their employer.' 987 F.2d at 815. In other words, the benefit cannot arise from the CBA modification itself; considered independently of the CBA, the transaction must yield enhanced efficiency, greater safety, or some other gain." *ATDA,* 26 F.3d at 1164 (quoting *Executives*).

CSXT argued, and the ICC accepted, that a consolidation of seniority rosters was necessary to effectuate the merger of the rail lines. This is both obvious on its face and was demonstrated by CSXT. First, there is little point in consolidating railroads on paper if a consolidation of operations cannot be achieved. It is obvious that separate and distinct parts, operating separately and distinctly, will not generate the value of consolidation. Second, CSXT demonstrated that changing crews at previous territorial boundaries of the former railroads, as would be required with separate seniority rosters, would increase costs and slow down transit times. Improvements in efficiency generated by a consolidated seniority roster will reduce CSXT's cost of service, resulting in

reduced rates to shippers and ultimately to consumers. The unions offered no evidence to the arbitrator or Commission to challenge CSXT's contentions of improved efficiency. Indeed, at oral argument, the unions' counsel conceded that these efficiencies are not open to dispute. In short, the record supports the Commission's finding that CSXT's proposed changes to the CBAs are necessary to effectuate the ICC-approved transaction.

### III. CONCLUSION

For the foregoing reasons, the petition for review is denied.